LISA WEISSMAN-WARD (CA SBN 298362)[1]
JAYASHRI SRIKANTIAH (CA SBN 189556)
IMMIGRANTS' RIGHTS CLINIC
Mills Legal Clinic at Stanford Law School
Crown Quadrangle, 559 Nathan Abbott Way
Stanford, California 94305-8610
Telephone: (650) 724-7396
Facsimile: (650) 723-4426
lweissmanward@law.stanford.edu
jsrikantiah@law.stanford.edu


Claudia Valenzuela*
Jessica Zhang*
IMMIGRANT LEGAL DEFENSE
1301 Clay St., #70010
Oakland, CA 94612
Telephone: (510) 519-1231
Facsimile: (510) 890-3101
claudia@ild.org
jessica@ild.org

*Attorney for Plaintiffs*

*Pro hac vice applications forthcoming*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| Ms. R.H.[2]; S.M.R., a minor child; J.M.R., a minor child,<br><br>     Plaintiffs,<br><br>     v.<br><br>UNITED STATES OF AMERICA,<br><br>     Defendant. | Case No.: _____<br><br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED ON ANY CLAIM SO TRIABLE** |

---

[1] Stanford Law School Immigrants' Rights Clinic Law students, Julia Gokhberg and Kirk Lancaster, participated in the writing of this complaint.
[2] Plaintiffs have filed a Motion to Proceed Under Pseudonyms and for a Protective Order concurrently with this Complaint.

# **INTRODUCTION**

1. Plaintiffs, Ms. R.H., and her two minor sons, J.M.R. and S.M.R., fled their native

El Salvador and arrived at the U.S.-Mexico border in October 2020. Plaintiffs sought asylum in

this country after Ms. R.H.'s husband – J.M.R. and S.M.R.'s father – was murdered execution-

style by gang members in El Salvador, and after those gang members threatened to murder Ms.

R.H. for cooperating with police. The United States government ("U.S. government"), through

its employees with U.S. Customs and Border Protection, a sub-agency of the Department of

Homeland Security ("CBP employees"), responded by forcibly separating Ms. R.H. from

J.M.R. and S.M.R. U.S. government employees then kept Ms. R.H. separated from J.M.R. and

S.M.R. for five months. Plaintiffs seek redress for the forced separation of their family by

employees of the U.S. government.

2. On or about October 13, 2020, CBP employees encountered Plaintiffs on the side

of the road in the United States. Plaintiffs told the CBP employees that they were seeking

asylum. In response, the CBP employees yelled and cursed at Plaintiffs, falsely accused Ms.

R.H. of presenting fraudulent documents, and falsely accused Ms. R.H. of smuggling and

trafficking J.M.R. and S.M.R. At the time, J.M.R. and S.M.R. were fourteen and eleven years

old, respectively.

3. CBP employees immediately sent Ms. R.H. back to Mexico by herself, despite

the fact that she had requested asylum. Plaintiffs wept and pled to remain together, even

begging for J.M.R. and S.M.R. to be sent back to Mexico too, as long as it meant the family

could stay together. CBP employees ignored Plaintiffs' pleas. Instead, they forcibly ripped Ms.

R.H. away from J.M.R. and S.M.R, as J.M.R. and S.M.R. screamed and attempted to cling to

their mother. CBP employees drove Ms. R.H. to the U.S.-Mexico border, where they forced her

to get out on the Mexican side of the border. Then, CBP employees took J.M.R. and S.M.R. to

the Eagle Pass South Border Patrol facility, where the CBP employees processed the boys as

"unaccompanied minors." CBP employees then placed the boys in the custody of employees

with the Office of Refugee Resettlement (ORR).

4.      When U.S. government employees forcibly separated Ms. R.H. from her two children, they and their superiors were already on notice of the significant harms caused by the forced separation of asylum-seeking families. At that point, the U.S. government's policy and practice of family separation had been judicially enjoined by a federal court for over two years.[3] By the time that Plaintiffs arrived together at the border seeking asylum, U.S. government officials had instituted a set of policies, which, on information and belief, remain in force into the present, governing the steps and procedures CBP employees must follow any time an officer encounters a group of adult and minor noncitizens that could constitute a family unit.[4] These policies govern how CBP employees determine whether a group is a valid family unit, including by using tools like DNA testing and interviewing, and under what limited circumstances CBP employees can separate a valid family unit, as well as the detailed recordkeeping, including supervisory approval, that is required when families were separated.

5.      CBP employees did not follow any of these governing policies and legal standards when they separated Plaintiffs. They failed to properly determine whether Plaintiffs were a valid family unit, either through DNA testing or interviewing. CBP employees also failed to follow procedures in documenting the separation of the family and in obtaining supervisory approval to do so.

6.      Because of U.S. government employees' unlawful separation of Plaintiffs, Ms. R.H. remained separated from J.M.R. and S.M.R. for nearly five months. For most of this time, Ms. R.H. did not know where her children were, whether they were well-cared for, or even whether they were alive. J.M.R. and S.M.R. similarly did not know where their mother was, or whether she was still alive.

7.      During these five months, ORR employees oversaw the transfer of J.M.R. and S.M.R. to three different locations in Texas, New York, and California. ORR employees

_____

[3] *See Ms. L. v. ICE* (*Ms. L. I*), 310 F. Supp. 3d 1133, 1149 (S.D. Cal. 2018), *modified,* 330 F.R.D. 284 (S.D. Cal. 2019).
[4] *See* 8 C.F.R. § 236.3(b)(7) (defining family unit as a group of two or more noncitizens consisting of at least one minor accompanied by their adult parent(s) or legal guardian(s)).

oversaw the placement of J.M.R. and S.M.R. in a home in which the boys were subject to harsh conditions, including being forced to remain inside a single bedroom for the vast majority of their days. J.M.R. and S.M.R. became severely depressed, anxious, and traumatized as they were forced to endure extended separation from their mother.

8.      Meanwhile, shortly after U.S. government employees summarily expelled Ms. R.H. to Mexico, individuals in Mexico, with the apparent involvement of Mexican officials, kidnapped Ms. R.H. and held her hostage. For an entire month, the kidnappers sexually and physically assaulted Ms. R.H. on a daily basis.

9.      Ms. R.H. managed to escape and began trying to reunify with J.M.R. and S.M.R. in the United States. She presented herself at the U.S.-Mexico border on at least four occasions, each time informing CBP employees that she had been separated from her children, J.M.R. and S.M.R., and explaining that she was seeking to locate them and be reunified with them. On each occasion, Ms. R.H. also expressed fear of returning to both El Salvador and Mexico. Each time, as they had when they separated Ms. R.H. from her sons, CBP employees turned her away in violation of the United States' *non-refoulement* obligations, which prohibit the government and its employees from returning an individual to a country in which she faces persecution or torture.

10.     Finally, in January 2021, with the assistance of pro bono legal counsel, Ms. R.H. filed a request for humanitarian parole to be reunited with her children. *See* 8 U.S.C. § 1182(d)(5). U.S. government employees approved the parole request on February 25, 2021, and Ms. R.H. lawfully entered the United States that same day.

11.     After enduring 131 days apart from one another, Plaintiffs were finally reunited on February 27, 2021.

12.     To this day, Plaintiffs continue to suffer from mental health illnesses and emotional distress because of the actions and failure to act by various employees of the U.S. government, including their treatment of and separation of Plaintiffs. Plaintiffs have all been

diagnosed with various mental health illnesses that require medical treatment and therapy. These mental health illnesses impact their daily lives.

13.     Plaintiffs now bring this action under the Federal Tort Claims Act, seeking compensation for the harms they suffered due to the tortious conduct of employees of the United States.

## JURISDICTION

14.     This Court has subject matter jurisdiction under 28 U.S.C. § 1346(b)(1).

15.     Plaintiffs bring this suit under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671 *et seq*. The FTCA has an administrative exhaustion requirement under which a claimant, before filing suit, must tender an administrative claim to the federal government. If the relevant agency does not finally dispose of the administrative claim within six months, the claimant is deemed to have exhausted administrative remedies. 28 U.S.C. § 2675(a). All Plaintiffs filed administrative claims with the relevant federal agencies on February 7, 2022, more than six months ago, and the agencies did not finally dispose of the Plaintiffs' claims.

## VENUE

16.     Because Plaintiffs reside in this District, venue is proper in the Northern District of California under 28 U.S.C. § 1402(b).

## INTRADISTRICT ASSIGNMENT

17.     This action is properly assigned to the San Jose Division pursuant to Civil Local Rule 3-2(c) and General Order 44(D)(1) because this action arises in Santa Cruz County and because FTCA cases are not exempt from intradistrict assignment.

## PARTIES

18.     Plaintiff Ms. R.H. resides in Soquel, California with her two minor children, Plaintiffs J.M.R. and S.M.R. When federal officials separated Plaintiffs from one another, J.M.R. was fourteen years old and S.M.R. was eleven years old. Ms. R.H. is the sole living biological parent to J.M.R. and S.M.R. and at all relevant times, was entitled to legal custody of

J.M.R. and S.M.R. Plaintiffs arrived in the United States seeking safety from persecution and torture in their home country of El Salvador.

19. Defendant, the United States of America is the appropriate defendant under the FTCA. 28 U.S.C. §§ 1346(b)(1), 2671, *et seq*. Defendant acted through the U.S. Department of Homeland Security ("DHS") and the U.S. Department of Health and Human Services ("HHS")—"federal agencies" of the United States under 28 U.S.C. § 2671—and their employees, officers, and agents, including but not limited to personnel of U.S. Customs and Border Protection ("CBP"), a subcomponent agency of DHS that is under the direction, authority, and control of the Secretary of Homeland Security; and the U.S. Office of Refugee Resettlement ("ORR"), a subcomponent agency of HHS that is under the direction, authority, and control of the Secretary of Health and Human Services.

20. The federal officers referenced in this Complaint were at all relevant times employees of the Defendant, working within the scope and course of their employment with the federal agencies listed above.

21. The federal officers referenced in this Complaint were at all relevant times working under the supervision of employees of the Defendant.

22. DHS, by and through employees of CBP, a subagency of DHS, are responsible for border management, which includes, but is not limited to, apprehending families between ports of entry and border enforcement at ports of entry involving determinations as to who to permit or deny physical entry into the United States.[5]

23. Employees of CBP were responsible for denying Plaintiffs entry into the United States on October 10, 2020 and for separating Plaintiffs from one another on October 13, 2020.

---

[5] U.S. Border Patrol is the part of CBP that is specifically responsible for patrolling the areas of the border between ports of entry. *See* https://www.cbp.gov/border-security/along-us-borders#:~:text=The%20United%20States%20Border%20Patrol,borders%20between%20ports%20of%20entry.

24. Employees of CBP were also responsible for denying Ms. R.H. entry into the United States each time that she subsequently attempted to seek asylum and reunification with J.M.R. and S.M.R.

25. Employees of DHS and CBP are responsible for supervising and managing detained children, including at the facilities where they processed and detained minors J.M.R. and S.M.R. before transferring them to ORR custody.

26. HHS, by and through employees of ORR, a sub-agency of HHS, is responsible for supervising and managing the detention of children the government classifies as unaccompanied, including at the facilities and licensed foster care home placements where they held J.M.R and S.M.R. for nearly five months while separated from their mother, Ms. R.H.

## FACTUAL ALLEGATIONS

27. U.S. government employees forcibly separated Ms. R.H. from her minor children, J.M.R. and S.M.R., when they arrived in the United States, seeking asylum from El Salvador. For nearly five months, U.S. government employees kept J.M.R. and S.M.R. in federal custody and expelled Ms. R.H. to Mexico, refusing to allow her entry to reunite with her children and seek asylum.

28. Family separation, such as that experienced by Plaintiffs, inflicts medical and psychological harm on both parents and children. The U.S. government and its employees were on notice that family separation causes serious harms, including physical harms and emotional distress to family members that are forcibly separated.[6]

29. A 2020 Physicians for Human Rights investigation based on psychological evaluations of migrant parents and children separated by employees of the U.S. government found pervasive symptoms and behaviors consistent with trauma. For example, a majority of

---

[6] House of Representatives, Subcommittee on Oversight and Investigations, Committee on Energy and Commerce Hearing (February 7, 2019) at lines 3208- 3294 (testimony of Dr. Julie Linton, Co-Chair of the American Academy of Pediatricians Immigrant Health Special Interest Group), https://docs.house.gov/meetings/IF/IF02/20190207/108846/HHRG-116-IF02-Transcript-20190207-U1.pdf.

those separated "met diagnostic criteria for at least one mental health condition, such as post-traumatic stress disorder, major depressive disorder, or generalized anxiety disorder consistent with, and likely linked to, the trauma of family separation."[7] The investigation found that the trauma resulting from family separation would likely result in "higher rates of chronic medical conditions, such as cardiovascular disease, cancer, and premature death"[8] and cause "an increased risk of psychiatric disorders such as anxiety, depression, and psychosis, and of detrimental coping behaviors such as smoking and the use of alcohol or drugs."[9] The report concluded that family separations conducted by employees of the U.S. government "constitute[d] cruel, inhuman, and degrading treatment" and rose "to the level of torture."[10]

30.     The harms of family separation are both immediate and long-term. Doctors have cautioned that children separated from their parents "can face immediate health problems, including physical symptoms like headaches and abdominal pain; changes in bodily functions such as eating, sleeping, and toileting; behavioral problems like anger, irritability, and aggression, and difficulty with learning and memory."[11] The longer a child is separated from their parent(s), the more severe the health and psychological and physical health outcomes.[12] The harms of separation can last long beyond reunification: "This type of highly stressful

---

[7] Physicians for Human Rights, "YOU WILL NEVER SEE YOUR CHILD AGAIN": THE PERSISTENT PSYCHOLOGICAL EFFECTS OF FAMILY SEPARATION 3 (Feb. 2020), https://perma.cc/HA9K-PRMN.
[8] *Id.* at 24.
[9] *Id.*
[10] *Id.* at 5.
[11] *Examining the Failures of the Trump Administration's Inhumane Family Separation Policy: Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Energy & Com.*, 116th Cong. 3243-52 (2019) (statement of Dr. Julie Linton, Co-Chair, American Academy of Pediatricians Immigrant Health Special Interest Group).
[12] *Id.* at 3558-62 (statement of Dr. Jack Shonkoff, Professor of Child Health and Development, Harvard Chan School of Public Health and Graduate School of Education; Professor of Pediatrics, Harvard Medical School) ("Forcibly separating children from their parents is like setting a house on fire, and prolonging that separation is like blocking the first responders from doing their job.").

experience can disrupt the building of children's brain architecture. Prolonged exposure to serious stress – known as toxic stress – can lead to lifelong health consequences."[13]

31. As alleged *infra* at ¶¶ 106-119; 150-155; 165-188, Plaintiffs all suffered immediate and long-term harms as a result of being forcibly separated by employees of the U.S. government.

**A.     Federal Law and Agency Regulations and Policies Established Mandatory Procedures That U.S. Government Employees Must Follow When Determining Whether and How to Separate Families.**

32. At all times during the U.S. government employees' separation of Plaintiffs, binding constitutional standards, court injunctions, court orders, consent decrees, statutes, agency regulations, agency policies, and standard agency practices (hereinafter "laws, policies, and standard agency practices") established heightened protections for families arriving at the border seeking asylum and limited CBP employees' ability to separate families.

33. The Supreme Court has long described the right to conceive and to raise one's children as "essential," *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923), "basic civil rights of man," *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942), and "[r]ights far more precious . . . than property rights," *May v. Anderson*, 345 U.S. 528, 533 (1953). "It is cardinal with us," the Court has said, "that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)).

34. The Constitution protects this weighty liberty interest in family integrity in all but a few narrow circumstances not present in Plaintiffs' case. *See, e.g.*, *D.B. v. Cardall*, 826 F.3d 721, 741 (4th Cir. 2016) (citing cases finding due process violation where state action interfered with rights of fit parents); *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1019 (7th Cir. 2000) (citing *Croft v. Westmoreland Cnty. Children & Youth Servs.*, 103 F.3d 1123, 1126 (3d

---

[13] Colleen Kraft, *AAP Statement Opposing the Border Security and Immigration Reform Act*, AM. ACAD. PEDIATRICS (June 15, 2018), https://perma.cc/JA43-SJAZ.

Cir. 1997)) (limiting state interest in "protecting children from their parents" to only cases where there is evidence of abuse or imminent danger of abuse).

35. Between July 2017 and July 2018, U.S. government employees engaged in the unprecedented and widescale practice of mass separation of migrant families at the border.[14] The "Zero Tolerance Policy" required that U.S. government employees criminally prosecute all migrants, including parents entering without inspection between ports of entry with their minor children, to the fullest extent of the law. To purportedly enforce this policy, U.S. government employees forcibly separated parents and children.

36. Legal challenges to the practice of family separation followed and on June 6, 2018, the U.S. District Court for the Southern District of California held that the migrant parent plaintiffs in *Ms. L. v. ICE* "had stated a legally cognizable claim that this broader family separation practice violated the right to family integrity and association under the Due Process Clause of the Fifth Amendment to the United States Constitution."[15]

37. Following overwhelming public outrage and the court's ruling in *Ms. L.*, former President Trump issued an executive order on June 20, 2018, revoking and ending his own administration's practice of widespread family separation.[16] "We're going to keep families together," said Trump in an Oval Office signing ceremony for the executive order.[17]

38. On June 26, 2018, the *Ms. L.* court issued a nationwide preliminary injunction on constitutional and statutory grounds that prohibited U.S. government employees from separating families in DHS custody, except in a limited set of circumstances—namely, where U.S.

---

[14] The Trump administration's practice of family separations was piloted in secret by DHS officials in Texas before being announced publicly in May 2018. *See* OFFICE OF THE INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC., DHS LACKED TECHNOLOGY NEEDED TO SUCCESSFULLY ACCOUNT FOR SEPARATED MIGRANT FAMILIES, at 5 (2019), https://perma.cc/95VB-UKH7; Jeff Sessions, Att'y Gen., U.S. Dep't of Justice, Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration (May 7, 2018) (transcript available at https://perma.cc/4TY6-24ZM).

[15] *Ms. L. v. ICE (Ms. L. II)*, 415 F. Supp. 3d 980, 985 (S.D. Cal. 2020).

[16] Exec. Order No. 13,841, 3 C.F.R. § 13841 (June 20, 2018).

[17] Miles Parks, Scott Detrow & Kelsey Snell, *Trump Signs Order to End Family Separations*, NPR (June 20, 2018), https://perma.cc/7DKL-6D4A.

government employees make "a determination that the parent is unfit or presents a danger to the child, unless the parent affirmatively, knowingly, and voluntarily declines to be reunited with the child in DHS custody."[18]

39.     Following the June 20, 2018 executive order and the June 26, 2018 *Ms. L.* preliminary injunction, the U.S. government—by and through DHS, its sub-agencies, CBP and USBP[19]—created policies and procedures regarding family separation practices.[20]

40.     Specifically, the CBP Commissioner issued a memorandum on June 27, 2018, which set forth directions on compliance with the *Ms. L* court order. The memorandum enumerated a limited set of circumstances under which CBP employees are permitted to separate a parent from their child. Those limited reasons include when: (1) the parent "has a criminal conviction(s) for violent misdemeanors or felonies," (2) CBP plans to refer the parent "for prosecution for a felony," (3) the parent "presents a danger to the child," or (4) the parent "has a communicable disease."[21]

41.     USBP officials reiterated this limited set of permissible reasons for separation in a memorandum to U.S. Border Patrol agents on January 10, 2020.[22]

42.     CBP policies also set forth the steps that must be taken in these rare instances that separating a family is permissible.[23]

---

[18] *Ms. L. I*, 310 F. Supp. 3d at 1149.

[19] The U.S. Border Patrol (USBP) is a sub-agency of the U.S. Customs and Border Protection (CBP) and is responsible for apprehending noncitizens between ports of entry. These agents are referred to as "Border Patrol agent." Border Patrol agents are bound by both USBP and CBP policies.

[20] *See, e.g.*, U.S. GOV'T ACCOUNTABILITY OFF., GAO-20-245, SOUTHWEST BORDER: ACTIONS NEEDED TO IMPROVE DHS PROCESSING OF FAMILIES AND COORDINATION BETWEEN DHS AND HHS 44 (2020) [hereinafter DHS PROCESSING OF FAMILIES], https://perma.cc/GS5Y-A39W.

[21] U.S. CUSTOMS & BORDER PROT., INTERIM GUIDANCE ON PRELIMINARY INJUNCTION IN *Ms. L. V. ICE*, NO. 18-428 (C.D. CAL. JUNE 26, 2018) (2018) [hereinafter CBP INTERIM GUIDANCE JUNE 27, 2018], https://perma.cc/EB4Q-52MD.

[22] U.S. BORDER PATROL, U.S. BORDER PATROL FAMILY UNIT SEPARATION GUIDANCE (2020) [hereinafter USBP FAMILY UNIT SEPARATION GUIDANCE JAN. 7, 2020], https://perma.cc/8VGP-5D2U.

[23] *Ms. L. II*, 415 F. Supp. 3d at 996 (citing Memorandum from Carla L. Prevost, Chief, U.S. Border Patrol to All Chief Patrol Agents and All Directorate Chiefs (Sep. 16, 2019)).

43. Even after the 2018 executive order, court injunction, and newly established CBP and USBP policies and procedures, U.S. government employees continued separating families, including under false pretenses that family units were fraudulent.[24]

44. In response to the continued separation of families, in January 2020, the *Ms. L* court issued another order enforcing its preliminary injunction. This order emphasized that U.S. government employees bore the "burden to prove lack of parentage before making a separation issue decision."[25]

45. As described in the allegations below, *see infra* ¶¶ 94-157, during the course of its interactions with Plaintiffs, the U.S. government and its employees violated federal law and policies and deviated from standard agency practices.

   **i.   Binding laws, policies, and standard agency practices govern how the U.S. government and its employees must determine the validity of a family unit.**

46. Mandatory laws, as well as policies and standard agency practices instituted by DHS, CBP, and USBP, govern CBP employees' obligation to fully and accurately assess whether a group of individuals arriving at the border is a "family unit."[26]

47. This assessment and ultimate determination is critical because family units are afforded the heightened protections described above, *see supra* ¶¶ 33-42.

48. CBP policy requires that CBP employees must "'clearly establish that the familial relationship is not bona fide' before making a separation decision."[27] In accordance with the January 2020 order in *Ms. L.*, CBP employees bear the burden of such a showing.[28]

---

[24] *Ms. L. II*, 415 F. Supp. 3d at 989 (describing how families were separating based on unverified familial relationships only to be reunified after DNA testing confirmed the legitimacy of the family unit).

[25] *Id.* at 990.

[26] Under DHS's regulations, a "family unit" is defined as a group of two or more individuals, consisting of at least one minor, accompanied by their "adult parent(s) or legal guardian(s)." 8 C.F.R. § 236.3(b)(7) (2019).

[27] *Ms. L. II*, 415 F. Supp. 3d at 990 (citing Memorandum from Todd A. Hoffman, Executive Director, Office of Field Operations to Directors, Field Operations (Oct. 1, 2018)) (alteration in original).

[28] *Id.*

Subjective concerns or an inability to validate documentation are not valid bases for separation.[29]

49.    Pursuant to DHS regulation, CBP employees are required to "consider all available reliable evidence" when evaluating the validity of a family relationship.[30]

50.    Under the same January 2020 *Ms. L.* order, the U.S. government and its employees "***must*** conduct DNA testing before separating an adult from a child based on parentage concerns."[31] The court found its directive "clearly warranted" because of the "fundamental right at issue" in these cases and "the harm that parents and children suffer when they are separated."[32] The court also stated that "if testing is not available at a particular facility, [U.S. government employees] can transfer the family to a facility where that testing is available, or take swabs from the parent and child and send the swabs for testing."[33]

51.    CBP employees had access to DNA testing at the time that they separated Plaintiffs. Throughout May 2019, in an effort to increase efficiency and accuracy when assessing familial validity, DHS agencies began piloting "Rapid DNA technology" in certain locations along the southwest border,[34] including in El Paso, Texas, and in Eagle Pass, Texas.[35] This technology allows DHS to compare "DNA profiles in approximately 90 minutes."[36]

52.    CBP policy also requires that "[i]n any instance where individuals are or claim to be a parent/legal guardian and child, ***any separation must be approved*** by . . . a Watch Commander (USBP)."[37]

---

[29] *Id.* (emphasis added).
[30] 8 C.F.R. § 236.3 (2019).
[31] *Ms. L. II*, 415 F. Supp. 3d at 990.
[32] *Id.*
[33] *Id.* At 989-90.
[34] Off. of Inspector Gen., OIG-22-27, CBP Officials Implemented Rapid DNA Testing to Verify Claimed Parent-Child Relationships 1 (2022), https://perma.cc/57HS-ZXSP.
[35] Defendants' Opposition to Plaintiffs' Motion to Enforce Preliminary Injunction at 11, *Ms. L. II*, 415 F. Supp. 3d 980 (S.D. Cal. 2020) (No. 3:18-cv-00428-DMS-MD).
[36] *Id.*
[37] CBP Interim Guidance June 27, 2018, *supra* note 20 (emphasis added); DHS Processing of Families, *supra* note 19, at 36-37.

53.     CBP and its employees are also expected to comply with standard agency practices when undergoing an investigation of familial validity.

54.     For example, in considering "all available reliable evidence," as required by regulation, CBP employees "review[] the documentation presented, such as birth certificates and passports (if available), for the purported family unit to determine the relationship between various members."[38] CBP employees "will observe and document the interaction between the travelers to learn whether a family relationship exists,"[39] and will "generally use their law enforcement training, such as interviewing skills, to help assess the validity of family relationships."[40]

55.     Moreover, when a CBP employee believes that a claimed family unit may be fraudulent, the agent "generally seeks the assistance of the consulate and other law enforcement resources in an effort to validate the documentation presented and confirm the true parents or legal guardians of the child."[41]

56.     Where a CBP employee suspects that the claimed family unit is presenting fraudulent documents and cannot make a determination as to the validity of the documents within a reasonable period of time, CBP employees' common practice is to transfer the purported parent(s) and child(ren) to ICE and ORR custody, respectively, in order to make use of these agencies' additional "law enforcement resources" to validate the familial relationship.[42]

---

[38] *Oversight of U.S. Customs and Border Protection: Hearing Before the S. Comm. on the Judiciary*, 115th Cong. 11 (2018) (response of Kevin K. McAleenan, Commissioner, U.S. Customs and Border Protection, to Sen. Charles E. Grassley, Chairman, S. Comm. on the Judiciary, Question for the Record on "Fraudulent Family Units"), https://perma.cc/Q7V7-64EM.
[39] *Id.*
[40] DHS PROCESSING OF FAMILIES, *supra* note 19, at 35-36; *see also, e.g.*, Declaration of Carrie Davison ¶ 3, *Ms. L. v. ICE*, No. 3:18-cv-00428-DMS-MD (S.D. Cal. Sept. 10, 2019), ECF No. 464-3; Declaration of Lloyd Easterling ¶ 36, *Ms. L. v. ICE*, No. 3:18-cv-00428-DMS-MD (S.D. Cal. Sept. 10, 2019), ECF No. 464-2.
[41] DHS PROCESSING OF FAMILIES, *supra* note 19, at 35-36.
[42] Declaration of Lloyd Easterling, *supra* note 39, ¶ 36; *see also* DHS PROCESSING OF FAMILIES, *supra* note 19, at 39-40 (noting that ICE officials "are able to conduct additional research about the validity of family relationships" after transfer of custody, and that ICE officers "have specialized forensic interviewing skills").

57.     These additional resources are particularly critical because data shows that CBP employees' suspicions of fraudulent family relations are wrong more often than they are right.[43] On July 18, 2019, the Acting Secretary of Homeland Security testified before Congress that of the 2,475 members of family units that CBP agents suspected to be invalid and referred to ICE for further assessment, only 352—approximately 14 percent—were actually found by ICE to be invalid.[44]

### ii.     Binding laws, policies, and standard agency practices govern the U.S. government and its employees' duty to document a family separation.

58.     Mandatory laws and policies as well as standard agency practices govern CBP employees' obligation to document the decision to separate a self-described family unit.

59.     Recording accurate and complete information to document a separation based on doubts about familial validity is important because ICE officials and ORR officials can rely on CBP employees' documentation to confirm whether a claimed family unit is invalid, to make decisions regarding family reunification, and to effectuate family reunifications where necessary.[45] Indeed, CBP's own policies require that these decisions be "well-documented,"[46] a requirement "of paramount importance."[47]

60.     CBP employees ***must*** document every decision to separate individuals based on alleged familial invalidity. Specifically, CBP employees ***must*** document apprehensions and the decision to separate in each individual's immigration records, including on a Form I-213.[48] When CBP employees separate minors from an adult, they ***must*** designate the minors as unaccompanied minors and they must complete a Form 93.

61.     An August 2020 USBP memorandum details "the steps that agents ***must*** take when completing Forms I-213 when a family unit has been judged to be invalid," including

---

[43] *Id.*
[44] *Id.*
[45] *Id.* at 40-41.
[46] CBP INTERIM GUIDANCE JUNE 27, 2018, *supra* note 20.
[47] USBP FAMILY UNIT SEPARATION GUIDANCE JAN. 7, 2020, *supra* note 21.
[48] DHS PROCESSING OF FAMILIES, *supra* note 19, at 40.

"ensuring that the forms for the parents and children contain the same narrative information to justify the separation."[49] CBP employees *must also* "indicate in their [electronic] data systems that the adult and child were separated" and list the reason for separation as "no family relationship" before referring the child to ORR as an unaccompanied minor.[50]

62.     When a determination is made that a group of individuals constitutes a "family unit," CBP agents *must assign* a family unit number and notate on the individual's Form I-213.[51] A family unit number is "a unique identifier which links the records of parents and children apprehended together."[52] Where CBP agents have assigned a family unit number but later determine that the family unit is "invalid," they *are required* to "delete the family unit number from the parents' and children's records, and *indicate the reason*" for the deletion from a list of options that includes "Fraudulent Claim."[53]

63.     When a CBP employee deems a family unit as a fraudulent one and separates the children from the adults, those children are then designated as "unaccompanied minors" (UACs).  CBP employees *must screen* UACs and document any indicators of human trafficking "in accordance with the Trafficking Victims Protection Reauthorization Act of 2008" ("TVPRA"), by completing the Form I-213 and Form 93, which includes a Trafficking Assessment.[54]

//
//
//

---

[49] U.S. Gov't Accountability Off., *Southwest Border: Actions Needed to Improve DHS Processing of Families and Coordination between DHS and HHS* (Feb. 19, 2020), https://perma.cc/8YGA-EXVD (emphasis added).
[50] DHS PROCESSING OF FAMILIES, *supra* note 19, at 36-38, 40.
[51] *Id.* at 28.
[52] *Id.*
[53] *Id.* at 38 (emphasis added).
[54] *Id.* at 35 n.55; *see also* U.S. GOV'T ACCOUNTABILITY OFF., GAO-15-521, UNACCOMPANIED ALIEN CHILDREN: ACTIONS NEEDED TO ENSURE CHILDREN RECEIVE REQUIRED CARE IN DHS CUSTODY 4, 18 (2015) [hereinafter CHILDREN IN DHS CUSTODY], https://perma.cc/X9F4-6MJN; U.S. Border Patrol, *UAC Screening Guide/CBP Form 93 (Revised)* (Mar. 4, 2019), https://perma.cc/EBV5-V7VA.

### iii. Binding Laws, policies, and standard agency practices govern the U.S. government and its employees' duty to provide medical support to an individual encountered at the border.

64. Binding laws and policies and standard agency practices govern CBP employees' obligation to provide medical support to individuals it apprehends at or near the border.

65. A CBP directive, "CBP Enhanced Medical Efforts," requires that "all individuals in custody *will* receive appropriate medical support in accordance with applicable authorities, regulations, standards, and policies."[55] The Directive states that CBP agents "*will* observe and identify potential medical issues for ***all persons in custody upon initial encounter***" and that persons "identified with medical issues of concern *will* receive a health interview or medical assessment or be referred to the local health system for evaluation."[56]

66. With family units in particular, CBP policy specifically states that "[i]n cases in which the parent/legal guardian has an urgent medical need that is not a communicable disease, officers and agents should attempt to keep the family together in CBP custody, or parole both for medical care or contact the local Office of Chief Counsel."[57]

### iv. Laws, policies, and standard agency practices govern the U.S. government and its employees' duty to abide by specific standards for detention and treatment of unaccompanied minors.

67. Mandatory laws and policies and standard agency practices govern the circumstances and conditions for CBP, ORR, and their employees' detention and treatment of unaccompanied minors.

68. CBP and ORR employees are ***required*** to ensure that the conditions of detention for UACs meet the standards delineated by the *Flores v. Reno* Agreement,[58] statutes, regulations, and agency policy.[59]

---

[55] OFFICE OF THE IMMIGRATION DETENTION OMBUDSMAN, OIDO-22-003, OMBUDSMAN ALERT: CRITICAL MEDICAL UNDERSTAFFING AT THE BORDER (2022).
[56] U.S. CUSTOMS & BORDER PROTECTION, CBP DIRECTIVE NO. 2210-004: ENHANCED MEDICAL SUPPORT EFFORTS (2019).
[57] CBP INTERIM GUIDANCE JUNE 27, 2018, *supra* note 20 (emphasis added).
[58] *Flores v. Reno*, No. CV 85-4544-RJK (C.D. Cal. 1997).
[59] KELSEY Y. SANTAMARIA, CONG. RSCH. SERV., IF11799, CHILD MIGRANTS AT THE BORDER: THE *FLORES* SETTLEMENT AGREEMENT AND OTHER LEGAL DEVELOPMENTS 1 (2021).

69.     The *Flores* Agreement is a ***binding*** consent decree that "sets forth a 'nationwide policy for the detention, release, and treatment of minors' in immigration custody—applying to UACs and accompanied minors alike."[60]

70.     Title 45 of the Code of Federal Regulations implements the *Flores* Agreement and is binding on ORR and its employees. For example, ORR employees ***must*** ensure that, "[w]ithin all placements, UACs shall be treated with dignity, respect, and special concern for their particular vulnerability."[61] ORR employees ***must*** also place "each UAC in the least restrictive setting that is in the best interest of the child and appropriate to the UAC's age and special needs."[62] And ORR employees ***must*** ensure that UACs are detained in "safe and sanitary" facilities.[63]

71.     When ORR employees oversee the transfer of a UAC to a "licensed program,"[64] such as a foster home, the UAC "remains in the custody of ORR, and may only be transferred or released under its authority."[65] Licensed programs ***must*** meet a set of minimum standards when housing UACs. For example, licensed programs "***must*** . . . [p]rovide or arrange for . . . [p]roper physical care and maintenance, including suitable living accommodations, food, appropriate clothing, and personal grooming items."[66] In addition, licensed programs "***must*** . . . [p]rovide or arrange for . . . [a]ctivities according to a recreation and leisure time plan that include daily outdoor activity, weather permitting, at least one hour per day of large muscle activity and one hour per day of structured leisure time activities."[67] ORR employees are ultimately responsible

---

[60] *Id.* (citation omitted).
[61] 45 C.F.R. § 410.102 (2019).
[62] 45 C.F.R. § 410.201 (2019).
[63] 45 C.F.R. § 410.102(c) (2019).
[64] *See* 45 C.F.R. § 410.101 (2019) ("Licensed program means any program, agency, or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children . . . . A licensed program must meet the standards set forth in § 410.402. All homes and facilities operated by a licensed program, including facilities for special needs minors, are non-secure as required under State law.").
[65] 45 C.F.R. § 410.207 (2019).
[66] 45 C.F.R. § 410.402(c)(1) (2019).
[67] 45 C.F.R. § 410.402(c)(5).

for ensuring that housing for UACs meets the criteria under federal regulations and standards.

**v. Nonrefoulement obligations govern the U.S. government and its employees' duty to not return an asylum seeker or refugee to a place where they fear persecution or torture.**

72. Mandatory laws and policies and standard agency practices govern the circumstances and conditions under which CBP's employees may permit or deny entry into the United States when an individual claims a fear of persecution or torture in their home country or in a country through which they have transited.

73. The U.S. government has mandatory, nondiscretionary obligations regarding the principle of *non-refoulement* as a party to the 1967 Protocol Relating to the Status of Refugees ("1967 Refugee Protocol"), which incorporates Articles 2 through 34 of the 1951 Convention Relating to the Status of Refugees ("1951 Convention").[68] Article 33 of the 1951 Convention provides that "[n]o Contracting State shall expel or return ('refouler') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."[69]

74. In addition, the U.S. government is bound by Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), as implemented by the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"),[70] which states that "[n]o State Party shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture."[71]

---

[68] The United States is not a party to the 1951 Convention but is a party to the 1967 Refugee Protocol. *See* 1967 Protocol Relating to the Status of Refugees, Jan. 31, 1967 19 U.S.T. 6261, 606 U.N.T.S. 267.

[69] 1951 Convention Relating to the Status of Refugees, July 28, 1951, art. 33, sec. 1, 19 U.S.T. 6259, 189 U.N.T.S. 150.

[70] Foreign Affairs Reform and Restructuring Act (FARRA), Pub. L. No. 105-277, Div. G, Title XXII, § 2242(a).

[71] United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, art. 3, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85.

75.     From October 2020 through December 2020, when the relevant events of this case took place, CBP also had policies in place related to the Centers for Disease Control and Prevention's (CDC) invocation of Title 42, which directed CBP employees to bar entry of most undocumented adult noncitizens attempting to enter at the U.S.-Mexico border, including those seeking asylum, on the basis of the COVID-19 pandemic.[72] Again, a USBP memorandum required that the CBP employees refer individuals who affirmatively expressed a fear of persecution or torture in the country to which they were being returned to USCIS employees and instructed agents to seek supervisory guidance.[73]

76.     From October 2020 through December 2020, when the relevant events of this case took place, the U.S. government and its employees were on notice that migrant women in Mexico, especially near the U.S.-Mexico border, faced a high likelihood of gender-based violence, including torture, sexual violence, abduction, and/or femicide based on credible reports.

77.     For years prior to the relevant events of this case, media outlets, non-governmental organizations, and non-profit groups reported on the widespread kidnappings, torture, and sexual assault that migrant women face in Mexico when coming to the United States.[74]

---

[72] U.S. BORDER PATROL, COVID-19 CAPIO, https://perma.cc/NS3E-MHSA.
[73] *Id.*; *see also* U.S. CUSTOMS & BORDER PROTECTION, FIELD GUIDANCE 42 U.S.C. 265, https://perma.cc/ECV3-9YZW.
[74] *See, e.g.*, *Full Transcripts: Trump's Speech on Immigration and the Democratic Response*, N.Y. TIMES (Jan. 8, 2019), https://perma.cc/FJ57-7R3R (quoting President Trump, who stated, "One in three women are sexually assaulted on the dangerous trek up through Mexico. Women and children are the biggest victims, by far, of our broken system."); Manny Fernandez, *"You Have to Pay With Your Body": The Hidden Nightmare of Sexual Violence on the Border*, N.Y. TIMES (Mar. 3, 2019), https://perma.cc/5JLT-JCSE (same); Arun Rath & Steve Inskeep, *The Rarely Told Stories of Sexual Assault Against Female Migrants*, NPR (Mar. 23, 2014), https://perma.cc/X7QY-DAJT ("Female[ migrants], a lot of times, may carry [condoms] just because there's an expectation that there may be an assault somewhere along the way [from Mexico to the United States]."); Christine Murray, *Migrants Raped and Trafficked as U.S. and Mexico Tighten Borders, Charity Says*, REUTERS (Feb. 11, 2020), https://perma.cc/2RB8-YSFP ("Central American migrants are being kidnapped, raped and trafficked in Mexico as they seek to enter the United States amid a migration crackdown, a medical charity said on Tuesday.");

**B.** **The U.S. Government and its Employees Violated Binding Laws and Policies and Deviated from Standard Agency Practices When They Forcibly Separated Plaintiffs.**

78. Between approximately October 2020 and February 2021, the U.S. government and its employees: 1) erroneously concluded that Plaintiffs were not a valid family unit; 2) refused to provide medical care to Ms. R.H.; 3) separated Plaintiffs at the border; 4) detained J.M.R. and S.M.R. in ORR custody under substandard conditions; 5) forcibly returned Ms. R.H. to Mexico; and 6) refused Ms. R.H.'s multiple requests for asylum and for reunification with J.M.R. and S.M.R. These actions violated binding laws and policies and deviated from standard agency practices.

---

Anna-Cat Brigida, *"I Didn't Have Anywhere to Run": Migrant Women Are Facing a Rape Epidemic*, VICE NEWS (Aug. 29, 2016), https://perma.cc/WGH4-WLGP (reporting that an "estimated 60 to 80 percent of female migrants from Central America are sexually assaulted on their journey" through Mexico to the United States); Adolfo Flores, *An Asylum-Seeker Who Was Kidnapped And Tortured With Acid Begged US Border Officers Not To Send Her Back. They Did Anyway.*, BUZZFEED NEWS (Mar. 7, 2020), https://perma.cc/A3X4-BBGZ; HUMAN RIGHTS FIRST, IS MEXICO SAFE FOR REFUGEES AND ASYLUM SEEKERS? (2018), https://perma.cc/8VAY-C3LE ("Asylum seekers returned to Mexico are targeted for kidnapping and assault in shelters, in taxis and buses, on the streets while looking for food, work, and shelter, on their way to and from U.S. immigration court, and even while seeking help from Mexican police and migration officers."); MÉDECINS SANS FRONTIÈRES, NO WAY OUT: THE HUMANITARIAN CRISIS FOR MIGRANTS AND ASYLUM SEEKERS TRAPPED BETWEEN THE UNITED STATES, MEXICO AND THE NORTHERN TRIANGLE OF CENTRAL AMERICA (2020) (finding that of 3,695 migrants who received mental health consultations in Mexico between January 2018 and September 2019, 78 % had suffered from exposure to violence and, among those individuals, "24.7 % presented risk factors associated with intentional physical violence (assault, sexual violence, and torture)"). *See also* Damià Bonmatí, *Migrants Returned to Mexico Describe Horror of Kidnappings, Torture, Rape*, NBC NEWS (Sept. 29, 2021), https://perma.cc/4VH7-TXCZ ("The criminals tortured some of the abducted migrants with blows all over their bodies to pressure the families who must pay the ransoms. Women were often repeatedly sexually abused by one or more kidnappers, said a woman who was raped, as well as several people who witnessed the crimes."); Kelly Laco, *Ernst Says Human Smugglers "Taunting" Law Enforcement By "Brutally" Raping Young Girls At Border, Urges Action*, FOX NEWS (July 20, 2022), https://perma.cc/K4J4-VUX9 ("The Border Patrol . . . told [a group of U.S. Senators] that about 30% of the women and girls that are being trafficked by the cartels up to the border are being sexually abused along the way. And those are just the ones that are reporting . . . . so the Border Patrol agents feel that 60% of them having been abused would be a more accurate number.").

**i. Plaintiffs fled El Salvador after Mara Salvatrucha gang members murdered Ms. R.H.'s husband and threatened to kill Plaintiffs.**

79.  Ms. R.H. is a 41-year-old[75] native and citizen of El Salvador. She is a widow and a mother of two boys, J.M.R. and S.M.R. She lived in El Salvador for her entire life before fleeing to the United States to seek asylum.

80.  While Plaintiffs still lived in El Salvador, members of the Mara Salvatrucha gang ("MS-13") terrorized Plaintiffs beginning in approximately August 2016, when Ms. R.H.'s husband (Mr. M.C.), first refused to assist the gang in its illicit activities, through October 2020. MS-13 gang members forced Plaintiffs from their home. The gang members used their home to conduct illegal drug trafficking activities. MS-13 gang members threatened the family and ordered Mr. M.C. to assist them in running drugs. He refused.

81.  Because of his defiance of the gang's demands, in 2017, MS-13 gang members executed Mr. M.C., in front of Plaintiffs.

82.  Ms. R.H. reported the murder to Salvadoran police and assisted law enforcement by providing a witness statement. Following her cooperation, MS-13 members threatened Ms. R.H. and repeatedly tracked her down, no matter where she and the children ran to hide. MS-13 gang members threatened Plaintiffs with death, including by holding a gun to Ms. R.H.'s head on one occasion, demanding that she retract her statement to the police.

83.  Plaintiffs fled El Salvador on or around October 1, 2020, to seek safety and asylum in the United States. J.M.R was fourteen years old and S.M.R. was eleven years old at the time.

**i. The U.S. government and its employees separated Plaintiffs, a valid family unit, and took J.M.R. and S.M.R. into ORR custody while returning Ms. R.H across the border to Mexico alone.**

84.  On October 10, 2020, Plaintiffs crossed the U.S.-Mexico border near Del Rio, Texas, in order to seek asylum in the United States.

85.  U.S. Border Patrol agents apprehended Plaintiffs shortly after they entered the

---

[75] The FTCA Administrative Complaint incorrectly states Ms. R.H.'s birthdate as October 14, 1992. Ms. R.H.'s correct birthdate is October 14, 1982.

United States. Ms. R.H. told the agents that she and her two children were afraid to return to El Salvador because MS-13 gang members had murdered her husband and were continuing to threaten Plaintiffs.

86.     The Border Patrol agents brought Plaintiffs to the Del Rio Border Patrol Station. There, Ms. R.H. presented CBP employees with multiple original identity documents: her Salvadoran identification card; her Salvadoran passport; the children's birth certificates, each listing her as their mother; the children's Salvadoran passports; her husband's death certificate; and the coroner's report documenting her husband's death.

87.     CBP employees examined the documents, took photos of the Plaintiffs, and fingerprinted them. At no point did the CBP employees at the station question the validity of the Plaintiffs' documents. Instead, the CBP employees determined that Plaintiffs were a valid family unit and assigned Plaintiffs a family unit number, CBP Family Unit ID FMU2110000891. Under information and belief, the CBP employees then processed Plaintiffs under Title 42 and returned them to Mexico. The process took approximately one hour.

88.     Plaintiffs were afraid to return to El Salvador because of the MS-13 gang's threats, and they did not feel safe remaining in Mexico because of the trafficking and violence they witnessed while traveling through Mexico.

89.     Three days later, on or around October 13, 2020, Plaintiffs attempted to enter the United States again to seek safety and asylum, this time near Eagle Pass, Texas.

90.     Plaintiffs crossed the Rio Grande River. This was particularly difficult for Ms. R.H. About one month before fleeing El Salvador, Ms. R.H. had undergone intestinal surgery. Because Ms. R.H. has diabetes, which slows healing, the incision site had not fully healed. While crossing the river, Ms. R.H.'s stomach started bleeding from the incision site. Ms. R.H. exited the river feeling sick and weak, and the combination of the crossing and her injury made it difficult for her to stand.

91.     After exiting the river, Plaintiffs walked for about an hour. Two men in uniforms stopped and apprehended Plaintiffs near Eagle Pass, Texas. The men drove a truck with a

"Sheriff" logo printed on it. Upon information and belief, the two men were local law enforcement agents.

92.     The uniformed men drove Plaintiffs for about two or three minutes. They stopped at a nearby desolate highway, where they met two male U.S. Border Patrol agents at the side of the road with a van. These uniformed men transferred Plaintiffs into the custody of the Border Patrol agents and then drove away.

93.     The Border Patrol agents were in uniform. The Border Patrol agents did not bring Plaintiffs to a Border Patrol station or any other immigration facility. Instead, the Border Patrol agents and Plaintiffs remained at the side of the road. Ms. R.H., still bleeding and fatigued from her injury, alternated between standing and sitting. J.M.R. and S.M.R. remained standing.

94.     Both agents spoke in Spanish to Ms. R.H. for the duration of the interaction but spoke in English to one another. The Border Patrol agents did not speak to J.M.R. or S.M.R. at all during the interaction.

95.     One of the two agents ("first agent") did most of the talking. He asked Ms. R.H. in Spanish, "Do you even speak English?"[76] in an aggressive and threatening tone. Ms. R.H. replied that she did not—Plaintiffs were all monolingual Spanish speakers at the time. In response to her answering that she did not speak English, he called her a piece of shit in Spanish and asked her what she was even doing in the United States.

96.     During the remainder of the interaction, the communication between Ms. R.H. and the CBP agents occurred in Spanish. Ms. R.H. expressed a fear of returning to El Salvador and explained that her husband had been murdered by gang members and that those same gang members were continuing to target and threaten Plaintiffs.

97.     Ms. R.H. presented the Border Patrol agents with a folder containing the same original identification documents that she had given to CBP employees at the Del Rio Border Patrol Station just three days prior: original passports for all three Plaintiffs; original birth

---

[76] The quotations provided in this section were spoken in Spanish and are translated for purposes of this complaint.

certificates for all three Plaintiffs; and Mr. M.C. (their deceased husband/father)'s death certificate and autopsy report.

98. The first agent quickly flipped through the documents, only spending a few moments scanning them in a cursory manner. He then handed them over to the second agent and said something to him in English that Ms. R.H. could not understand. The second agent did not appear to read the documents at all.

99. The first agent then accused Ms. R.H. of presenting false documents. He did not indicate which document(s) he believed to be false.

100. The first agent also repeatedly yelled at Ms. R.H. and called Ms. R.H. a trafficker during the interaction. The agent offered no basis for making this accusation. Ms. R.H. vehemently denied the accusation, explaining that J.M.R. and S.M.R. were her sons.

101. Based on these accusations, the first agent told Ms. R.H. that he was going to separate her from J.M.R. and S.M.R.

102. Ms. R.H. insisted that J.M.R. and S.M.R. were her biological sons. She explained that Plaintiffs had sought asylum in the United States just three days prior, and that Border Patrol agents had taken them to a facility, where CBP employees photographed and fingerprinted them. She explained that CBP employees had allowed Plaintiffs to remain together. The Border Patrol agents ignored Ms. R.H. and made no effort to investigate or confirm her story.

103. Ms. R.H. became increasingly desperate to prove that she was J.M.R. and S.M.R.'s mother. She begged the Border Patrol agents to administer a DNA test to verify their relationship. Even though CBP employees had access to quick, reliable DNA testing at their Eagle Pass facilities, the Border Patrol agents refused to administer or otherwise provide access to DNA testing. Instead, the first agent, still speaking in Spanish, told Ms. R.H. to shut up.

104. The Border Patrol agents also failed to conduct any meaningful investigation into the Plaintiffs' familial validity. They did not take Plaintiffs to a Border Patrol station. They did not take their pictures. They did not fingerprint them. They did not conduct interviews to

determine if the Plaintiffs were a family unit. They did not ask J.M.R. or S.M.R. any questions about their relationship with Ms. R.H.

105.    The Border Patrol agents made no phone calls during the encounter. Upon information and belief, the Border Patrol agents never referred the family to ICE and ORR for additional investigation into the validity of the family unit.

106.    J.M.R. and S.M.R. stood beside Ms. R.H. throughout the encounter. They listened to the Border Patrol agents curse at their mother and speak to her in a derogatory and disdainful tone. They watched as Ms. R.H. became increasingly panicked and then as she began to sob. J.M.R. and S.M.R., afraid to be separated from their mother, also began to weep and repeatedly told the agents that Ms. R.H. was their mother. Instead of listening to the boys, the Border Patrol agents reiterated their accusation that Ms. R.H. was trafficking J.M.R. and S.M.R. They further accused her of training her sons to cry.

107.    During the encounter, Ms. R.H. was visibly ill and bleeding from her abdomen. The hand she was using to apply pressure to her wound was covered in blood and was plainly visible to the Border Patrol agents. Ms. R.H. showed the agents her bloody hand and told them that she needed medical attention.

108.    The agents again told Ms. R.H. to "shut up." The agents refused to offer her medical attention, did not conduct a health interview or medical assessment, and did not refer Ms. R.H. to a local health system for evaluation. Instead, they accused Ms. R.H. of faking her injury as a pretext to stay in the United States.

109.    Finally, desperate to keep her children with her, Ms. R.H. begged the Border Patrol agents to return J.M.R. and S.M.R. to Mexico with her. The Border Patrol agents refused.

110.    The Border Patrol agents demanded that Ms. R.H. get into their van. They threatened that if she did not comply, they would separate her from her sons by force. Ms. R.H. said she would not get into the van without her children. The agents each grabbed one of her arms, one on her left and one on her right, and forcibly placed her in the van. J.M.R. and S.M.R. cried out and fought to stay with her, clinging to Ms. R.H. as the agents dragged her away.

111.    The Border Patrol agents loaded Ms. R.H. into a compartment of their vehicle without any windows. Upon information and belief, the agents then loaded J.M.R. and S.M.R. into a separate compartment of the same vehicle, where the boys could not see or hear their mother.

112.    Upon information and belief, the agents neither requested nor received any supervisory-level approval for the separation.

113.    After a short drive, the Border Patrol agents stopped the vehicle and unloaded Ms. R.H. from the van. The agents did not give Ms. R.H. any papers or documents and did not provide her with any information about where they would take J.M.R. and S.M.R. or how to contact them. The agents ordered Ms. R.H. to walk across a bridge back to Mexico by herself. The agents then drove off, with J.M.R. and S.M.R. still in the separate compartment of the van.

114.    Separated from their mother, J.M.R. and S.M.R. were terrified. They had no idea where the Border Patrol agents were taking them or what had happened to their mother.

115.    This was the first time J.M.R. and S.M.R. had ever been away from their mother for more than a night, let alone with strangers and in a different country. The Border Patrol agents' separation of Plaintiffs especially terrified J.M.R. and S.M.R.

116.    While in the van, J.M.R. and S.M.R. repeatedly asked Border Patrol agents about their mother's whereabouts. The agents did not answer their questions.

117.    The Border Patrol agents took J.M.R. and S.M.R. to the Eagle Pass South Border Patrol Station, where CBP employees fingerprinted and photographed them. J.M.R. and S.M.R. again asked the Border Patrol agents and other CBP employees about what had happened to their mother, where she was, and when they could be reunited with her. The Border Patrol agents and other CBP employees did not answer their questions.

118.    The entire interaction and life-altering decision to separate the family happened in the span of approximately ten minutes on the side of the road. The Border Patrol agents' decision to separate Plaintiffs resulted in Plaintiffs' separation from each other for nearly five months.

119.    When the Border Patrol agents failed to provide Ms. R.H. with appropriate

medical care and when they determined that Plaintiffs were not a valid family unit, and subsequently separated Plaintiffs, they violated the laws and policies and deviated from standard agency practices described, *supra* in ¶¶ 46-57; 64-66.

> ### ii. The U.S. government and its employees did not document their encounter with Plaintiffs and did not document their decision to separate Plaintiffs or the fact of the separation of Plaintiffs.

120.     Upon information and belief, CBP employees did not make any record of their encounter with all three Plaintiffs on October 13, 2020. On October 14, 2020, CBP employees at the Eagle Pass South Border Patrol Station created Forms I-213 and 93 for both J.M.R. and S.M.R., as required for children designated as UACs.

121.     On both J.M.R. and S.M.R.'s Form I-213s, CBP employees fully omitted the fact that Border Patrol agents had separated J.M.R. and S.M.R. from Ms. R.H. In fact, CBP employees failed to make any mention whatsoever of the Ms. R.H.'s presence in their Form I-213 narratives.

122.     Instead, the narrative portion of J.M.R. and S.M.R.'s Forms I-213 merely states that J.M.R. and S.M.R. were "apprehended by [a] Border Patrol Agent . . . near Eagle Pass, Texas," and that each "was accompanied by his brother . . . at the time of the encounter."

123.     While Border Patrol agents accused Ms. R.H. of trafficking J.M.R. and S.M.R. on October 13, 2020, when CBP employees completed Forms I-213 and Forms 93 the next day for both J.M.R. and S.M.R, CBP employees notated that indicators of human trafficking were "not present" on J.M.R.'s Form 93. They made no mention at all of possible trafficking on S.M.R.'s Form 93 and left the Trafficking Assessment section of S.M.R.'s Form 93 entirely blank.

124.     CBP employees' notation that human trafficking was "not present" on J.M.R.'s form and complete lack of notation on S.M.R.'s form contradict the Border Patrol agents' basis for separating the family.

125. CBP employees also deleted the family unit number that CBP employees had issued to Plaintiffs just three days earlier. Upon information and belief, CBP employees failed to indicate the reason for the deletion in any of Plaintiffs' records.

126. When CBP employees, both during the point of separation and later when the boys were in custody for processing before being moved into ORR custody, failed to document their encounter with Plaintiffs, their decision to separate Plaintiffs, including any allegations of trafficking, and the separation itself, they violated the laws and policies and deviated from standard agency practices described paragraphs 59 through 63, *supra*.

> iv. **The U.S. government and its employees separated Plaintiffs for five months, holding J.M.R. and S.M.R. in ORR custody and forcing Ms. R.H. to remain in Mexico the entire time, and ignored her repeated requests for reunification and asylum.**

127. DHS employees then held J.M.R. and S.M.R. in custody for approximately two days. On or around October 15, 2020, DHS officials transferred J.M.R. and S.M.R. to the custody of ORR, the sub-agency of HHS responsible for the care for unaccompanied migrant children in the United States.

128. ORR employees first placed J.M.R. and S.M.R. in St. PJ's Children's Home, a shelter in San Antonio, Texas. J.M.R. and S.M.R. remained at this shelter for over a month, from approximately October 15, 2020, to approximately November 28, 2020.

129. Meanwhile, Ms. R.H. was alone in Mexico. For the first week of their separation from one another, Ms. R.H. had no idea where J.M.R. and S.M.R were, whether they were alive or dead, or what had happened to them.

130. J.M.R. had memorized the phone number of a family friend living in the United States, who was able to connect Ms. R.H. to J.M.R. and S.M.R. approximately one week after the family's separation. It was at this time that Ms. R.H. finally learned that J.M.R. and S.M.R. were living in a shelter in Texas.

131. For about another week or so, Ms. R.H. remained in contact with J.M.R. and S.M.R. through phone calls arranged and monitored by an employee or employees working

under ORR oversight at the shelter in Texas. But then, J.M.R. and S.M.R. abruptly lost all contact with Ms. R.H. This employee or employees told J.M.R. and S.M.R. that their mother's phone was no longer working and that they could not reach her. J.M.R. and S.M.R. did not hear news of their mother again until sometime in December 2020. During this entire time, they did not know where their mother was or whether she was alive.

132.    J.M.R. and S.M.R. did not know this at the time, but Ms. R.H. had been unreachable because unknown individuals, affiliated with Mexican law enforcement officials, had kidnapped and held her hostage in Mexico.

133.    In late October 2020, approximately two weeks after CBP employees separated Plaintiffs, Ms. R.H. attempted to reach the U.S. border again to be reunited with her children. As she neared the U.S.-Mexico border, individuals identifying themselves as Mexican police stopped her and said that they were taking her to an immigration office. However, the individuals actually took Ms. R.H. to a town called Ascensión, Mexico, where they brought her to a building that appeared to be a restaurant from the outside. Ms. R.H. saw men in the uniform of Mexican federal agents standing guard in front of the building.

134.    Once inside, it became clear to Ms. R.H. that the building was anything but a restaurant. Ms. R.H. observed men and women in shackles. Her captors, who Ms. R.H. believes were associated with Mexican law enforcement and/or Mexican cartels, held her and the others hostage in the building for about one month.

135.    For approximately one month, Ms. R.H.'s captors repeatedly beat and tortured her. They forced her to stand naked with her arms secured to the ceiling above her head. Her captors raped her on a near daily basis, sometimes more than once a day. The kidnappers pressed hot cigarettes out on her skin and held guns to her head, threatening to kill her unless she paid a ransom.

136.    On one occasion, when one of the captors guarding the hostages passed out from drinking, another woman being held captive managed to steal the captor's phone. The woman called the police and begged them to come help. But rather than rescuing the hostages, the

Mexican police alerted the captors of the woman's phone call. The captors then shot and killed the woman in front of Ms. R.H. and the others.

137.    After about one month, the captors loaded Ms. R.H. and the other hostages into a Mexican federal police van and bound their hands and feet with rope. The captors then drove Ms. R.H. and the others deep into the desert, where they informed Ms. R.H. that they planned to kill her and the others.

138.    Once all of the hostages were unloaded from the van, Ms. R.H. overheard the captors arguing about whether they should shoot the hostages or just leave them to die. The captors opted for the latter. They drove away in the van, leaving Ms. R.H. and the others, still bound by rope, in the middle of the desert.

139.    After their captors were gone, Ms. R.H. managed to free herself. She then helped untie the others. The group walked for several days through the Mexican desert, subsisting on food and water left in the desert by non-profit border organizations to assist migrants.

140.    Eventually, two strangers driving by in a pickup truck drove the group into a nearby town. From there, Ms. R.H. traveled to Ciudad Juárez, Mexico.

141.    Following her ordeal in captivity in Mexico, from approximately late November to the end of December 2020, Ms. R.H. attempted to enter the United States through a CBP port of entry approximately four times, each time asking for asylum and reunification with J.M.R. and S.M.R. in the United States. On each occasion, Ms. R.H. told CBP employees that she was afraid to return to both El Salvador and Mexico. She informed CBP employees that she had been kidnapped in Mexico and tried to describe the horrific harm she endured, but they cut her off each time. On each occasion, Ms. R.H. told CBP employees that she had been separated from her sons. Yet, each time, the CBP employees ignored her pleas to be reunited with her sons, denied there was any process to locate or be reunited with her sons, and sent her back to Mexico despite their nonrefoulement obligations.

142.    Ms. R.H. felt helpless, despondent, and desperate throughout this time. She had no idea where her children were and was desperate to find them. She was sick with worry about

their physical and emotional well-being. She was particularly worried about J.M.R., who had battled severe depression after his father was murdered in front of them.

143. While Ms. R.H. was attempting to locate her sons and reach safety in the United States, ORR employees were moving J.M.R. and S.M.R. in between various locations in different cities within the United States.

144. On or about November 28, 2020, ORR employees moved J.M.R. and S.M.R. from San Antonio, Texas, to Abbott House, an ORR-licensed transitional foster care home in the Bronx, New York. ORR employees did not provide any explanation to J.M.R. or S.M.R. about why they were changing the boys' location and moving them to a different part of the United States, further exacerbating the boys' anxiety, confusion, and panic.

145. From approximately November 2020 to February 2021, while in the custody of ORR in New York, ORR employees failed to provide J.M.R. and S.M.R with suitable living conditions.

146. ORR employees placed J.M.R. and S.M.R. with a foster family that forced the boys to spend the majority of their days and nights in a closed bedroom, only allowing them to leave when they needed to use the bathroom. The foster parents forced J.M.R. and S.M.R. to eat in their room, while the parents ate meals together with their own children. They did not allow J.M.R. and S.M.R. to speak to or otherwise interact with their sons or the outside world.

147. These conditions further exacerbated both J.M.R.'s and S.M.R.'s state of depression and anxiety. The boys were both worried about their mother's health and safety, particularly because of the dangerous conditions they had personally witnessed in El Salvador and Mexico.

148. J.M.R. relapsed into a state of depression similar to that which he experienced after his father's murder. He refused to get out of bed, cried often, stopped speaking, and refused to eat. S.M.R experienced insomnia and had frequent nightmares relating to the separation from his mother.

149. Upon information and belief, during this entire time, ORR employees did not attempt to locate alternative less restrictive custodial arrangements for J.M.R. and S.M.R., including with a family friend in California.

150. On or about December 7, 2020, J.M.R. and S.M.R. met with an attorney working for a legal services provider that was a subcontractor with ORR. The attorney attempted to conduct a legal screening and intake. J.M.R. and S.M.R. were so traumatized that they could not even complete a full initial legal screening. They could not answer questions in complete sentences. In a letter to DHS-CBP, J.M.R and S.M.R.'s attorney documented that she was unable to finish the intake because of how mentally overwhelmed and anxious the boys were.

151. During a second meeting with this same attorney on or about December 21, 2020, J.M.R. and S.M.R. were able to provide some additional information, including the fact that the boys and their mother were seeking asylum in the United States when CBP employees forcibly separated them. Whenever the attorney asked about the boys' mother, J.M.R.'s voice grew quiet, almost inaudible, and he tried desperately to hold back tears. S.M.R. remained quiet and visibly upset throughout their conversation.

152. On or about December 8, 2020, Ms. R.H. learned that her sons were in New York, and she spoke to Abbott House staff.

153. Around mid-December 2020, J.M.R. and S.M.R.'s attorney helped set up a video call for the family. Ms. R.H. saw her children's faces for the first time in months. Ms. R.H. was overjoyed to see them, even if it was for only a short period of time over a video call. S.M.R. kept repeating, "Mommy I love you. Mommy I love you." S.M.R.'s mood and demeanor noticeably improved after he learned that his mother was alive.

154. J.M.R. and S.M.R.'s attorney met with them approximately six times in total. In her correspondence to DHS-CBP, the attorney described how J.M.R. and S.M.R. continued to suffer severe anxiety and trauma due to the separation from their mother, even after they learned that their mother was alive.

155.     On or around January 19, 2021, Ms. R.H. spoke with J.M.R. and S.M.R. over another video call. She observed that J.M.R. was not doing well. She learned that he was not eating, getting out of bed, or speaking much. Ms. R.H. felt distraught seeing her son like this, and feared that J.M.R.'s condition would only worsen the longer they were separated.

156.     Ms. R.H. eventually received the contact information for the boys' foster mother in New York. Ms. R.H. reached out to her to try and schedule additional calls with J.M.R and S.M.R. But the foster mother refused to allow Ms. R.H. to speak with the boys, never responding to Ms. R.H.'s texts. Instead, Ms. R.H. had to rely on J.M.R. and S.M.R.'s attorney to schedule calls with her children. Thus, Ms. R.H. was only able to speak with J.M.R. and S.M.R. four or five times during the three months they were in New York.

157.     By holding J.M.R. and S.M.R. in unsuitable conditions in ORR custody, forcing Ms. R.H. to remain in Mexico, and preventing Ms. R.H. from reuniting with J.M.R. and S.M.R. and applying for asylum, the U.S. government and its employees violated the laws and policies and deviated from standard agency practices described paragraphs 68 through 77, *supra.*

> **v.     After nearly five months of unjustified separation, Ms. R.H. obtained humanitarian parole and reunited with J.M.R. and S.M.R. in the United States.**

158.     In late December 2020 or early January 2021, Ms. R.H. met an U.S. immigration attorney who agreed to assist Ms. R.H. file a request for humanitarian parole pro bono.

159.     On or about January 20, 2021, Ms. R.H.'s attorney filed an application for humanitarian parole with CBP. The basis for the request was family reunification. In support of her application, Ms. R.H. attached the same evidence of parentage and familial validity that she had previously provided to the Border Patrol agents who forcibly separated Plaintiffs.

160.     In just a matter of weeks, DHS employees granted Ms. R.H.'s request for humanitarian parole. Ms. R.H. entered the United States through the Area Port of Yselta in El Paso, Texas, on February 25, 2021.

161.    In approximately February 2021, just prior to Ms. R.H.'s entry into the United States, ORR employees transferred J.M.R. and S.M.R. for a third time to La Verne, California, in preparation for their reunification with Ms. R.H.

162.    On or about February 27, 2021, Plaintiffs were finally reunited at the San Jose Mineta International Airport in San Jose, California.  J.M.R. and S.M.R. ran into Ms. R.H.'s arms the moment they saw her. Ms. R.H., J.M.R., and S.M.R. held each other tightly and cried. For the first time in months, the tears streaming down their faces were ones of joy.

163.    When the U.S. government and its employees separated Ms. R.H. from J.M.R. and S.M.R. for nearly five months, they violated the laws and policies and deviated from standard agency practices described paragraphs 32 through 77, *supra*.

**C.    Plaintiffs Suffered and Continue to Suffer Severe Emotional and Psychological Harm on Account of the U.S. Government's Decision to Separate Them.**

164.    Since their reunification, Plaintiffs have lived near Santa Cruz, California. Ms. R.H. works as a caretaker for a toddler. J.M.R., who is now seventeen years old, attends high school. S.M.R., who is now fourteen years old, began high school this past August.

**i.    Harms to Ms. R.H.**

165.    Ms. R.H. suffered and continues to suffer severe mental health consequences and emotional distress as a result of U.S. government employees' separation of her from J.M.R. and S.M.R., refusal to permit her to seek asylum or provide her with medical care, and repeatedly returning her to Mexico, a country where she faced danger.

166.    Ms. R.H. experienced emotional distress when Border Patrol agents accused her of engaging in fraud and human trafficking of her own children. She experienced emotional distress when Border Patrol agents cursed and yelled at her in front of J.M.R. and S.M.R. She also experienced both physical pain and emotional distress from the Border Patrol agents' refusal to treat her open and bleeding stomach wound.

167.    Ms. R.H. experienced emotional distress when Border Patrol agents forcibly ripped her away from her weeping children, not knowing where they would be taken, who would care for them, and whether she would ever see them again.

168.    For nearly five long months, Ms. R.H. experienced acute anxiety and distress not knowing where her children were or if they were alive. During this entire period when she was separated from her sons, Ms. R.H was frequently unable to sleep, and often had no appetite. She suffered from chronic headaches.

169.    Following the separation, Ms. R.H. was diagnosed with depression, anxiety, and Post Traumatic Stress Disorder (PTSD). Ms. R.H. is under the care of a psychiatrist as well as a therapist, with whom she meets weekly. Ms. R.H. must take daily prescription medications for depression, anxiety, and dysregulated sleep. Ms. R.H. has regular, persistent, and intense symptoms of these psychiatric disorders.

170.    As a result of the separation, Ms. R.H. experiences suicidal ideations. At one point, her suicidal ideation was so severe that her mental health providers recommended a 24-hour care facility to protect her against self-harm.

171.    As a result of the separation, Ms. R.H. experiences frequent panic attacks. These panic attacks can be incredibly severe. In one instance, when someone raised their voice at Ms. R.H., this triggered a memory of the Border Patrol agents yelling at her during the separation and sparked a panic attack. The panic attack was so severe that she blacked out and woke up hours later in a hospital. Prior to when her doctor prescribed her medication, Ms. R.H.'s panic attacks occurred nearly daily and often lasted many hours and even multiple days. Even with medication, her panic attacks are still a regular occurrence.

172.    As a result of the separation, Ms. R.H. suffers from nightmares and flashbacks relating to being separated from J.M.R. and S.M.R. When she experiences a flashback, she feels an overwhelming loss of control and terror.

173. Ms. R.H. still finds talking about the separation debilitating. She cries frequently and has adopted a coping mechanism of avoidance to maintain the mental acumen necessary to care for herself and J.M.R. and S.M.R.

### ii. Harms to J.M.R. and S.M.R.

174. J.M.R. and S.M.R. also suffered and continue to suffer severe emotional distress as a result of the forcible separation from their mother by U.S. government employees. U.S. government employees forcibly separated them from their mother, detained them in multiple unfamiliar locations, in an unfamiliar country for nearly five months. For the majority of the separation, the boys did not know where their mother was, whether she was alive, and if they would ever see her again.

175. J.M.R. and S.M.R. were particularly vulnerable after having witnessed the execution-style shooting of their father and after having to hide from the MS-13 gang. CBP employees were on notice of this fact, because Plaintiffs told CBP employees their reasons for seeking asylum in the United States on or about October 10 and October 13, 2020. Because trauma is cumulative,[77] in the cases of J.M.R. and S.M.R., being forcibly separated from their mother after they witnessed their father being killed amplified their symptoms and led to significant mental health disorders.

176. While J.M.R.'s mental health had significantly improved since the time of his father's death, the forced separation from his mother sent him back into an acute depressive state. J.M.R.'s symptoms were especially severe during the months he was in New York. As a result of the separation, he worried constantly about his mother. He was frequently unable to get out of bed and refused to eat for days at a time.

---

[77] *See, e.g.*, Neal Krause et al., *A Descriptive Epidemiology of Lifetime Trauma and the Physical Health Status of Older Adults*, 19 PSYCHOLOGY AND AGING 637, 637 (finding that cumulative trauma during a person's lifetime can have an overall effect on health in one's later years); Sharain Suliman et al., *Cumulative Effect of Multiple Trauma on Symptoms of Posttraumatic Stress Disorder, Anxiety, and Depression in Adolescents*, 50 COMPREHENSIVE PSYCHIATRY 121, 121 (2009) (finding that "adolescents exposed to multiple traumas are more likely to experience more severe symptoms of PTSD and depression than those who experience a single event").

177.    As a result of the separation, J.M.R. has been diagnosed with PTSD, depression, and anxiety. He must take medications for anxiety, depression, and sleep. He continues to exhibit symptoms of depression, trauma, and anxiety, and thus, continues to need mental health treatment.

178.    J.M.R.'s symptoms of depression manifest in his everyday behaviors. He rarely speaks to others and struggles to make friends. J.M.R. also struggles to eat, and he will sometimes go an entire day without food. He often does not want to get out of bed in the morning—some days, he is not able to shower or brush his teeth, and his mother will have to force him to bathe.

179.    As a result of the separation, J.M.R. experiences frequent migraine headaches that leave him bedridden.

180.    As a result of the separation, J.M.R. experiences suicidal ideation and has told Ms. R.H. on multiple occasions that he wants to end his life. On one occasion, he called Ms. R.H. from the high school bathroom floor, crying and expressing his desire to die.

181.    At school, J.M.R. is respectful and kind; however, he has had a poor attendance record, as a result of his depression. When he does go to school, he does not engage with the work or his peers. His academic performance is low.

182.    As a result of the separation, at night, J.M.R. experiences frequent nightmares that disrupt his sleep. When these nightmares wake him, he will go to sleep on the floor beside his mother's bed to seek a sense of safety.

183.    Like J.M.R., as a result of the separation, S.M.R. has also been diagnosed with multiple psychological disorders and is under the care of a mental health provider. S.M.R. has been diagnosed with Separation Anxiety Disorder and subsyndromal trauma symptoms. The disorders are significant, and he continues to need mental health treatment.

184.    Since he has been reunited with his mother, S.M.R. continues to demonstrate symptoms of trauma and anxiety.

185.     As a result of the separation, S.M.R. has an exaggerated sense of negative outcomes—for example, when his brother is upset at him, S.M.R. is afraid that his brother will never speak to him again, even though this has never occurred.

186.     As a result of the separation, S.M.R. frequently worries about being separated from Ms. R.H. again. He becomes agitated when he hears a knock on the door, believing it is someone coming to take him away. He also often fears that ICE will come and take his mother away.

187.     As a result of the separation, S.M.R. also suffers from physical pain stemming from the separation, including chronic neck pain. In particular, he suffers from these physical pain symptoms when he thinks about being separated from Ms. R.H.

188.     As a result of the separation from their mother, both J.M.R and S.M.R. continue to battle the emotional and mental health consequences.

# CAUSES OF ACTION

## COUNT 1—INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

189.     Plaintiffs reallege the foregoing paragraphs and incorporate them herein by this reference.

190.     By engaging in the acts described above, Defendant and its employees engaged in extreme and outrageous conduct with the intent to cause, or with reckless disregard for the probability of causing, Plaintiffs to suffer severe emotional distress as an actual and proximate result of their conduct, including but not limited to their violation of mandatory court orders, statutes, regulations, and policies, and all of the other misconduct described herein. The conduct alleged above includes extreme and outrageous conduct, particularly in light of the obligations arising from Defendant and its employees' duty of care toward Plaintiffs.

191.     As a direct and proximate result of Defendant and its employees' conduct towards Plaintiffs, Plaintiffs suffered serious emotional distress.

192.     Under the FTCA, the United States is liable to Plaintiffs for intentional infliction of emotional distress.

## COUNT 2—NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

193.     Plaintiffs reallege the foregoing paragraphs, 1 through 188 and incorporate them herein by this reference.

194.     Defendant and its employees referenced above had a duty to Plaintiffs to act with ordinary care so as not to cause harm or injury to them.

195.     By engaging in the acts described above, Defendant and its employees engaged in negligent and grossly negligent conduct, including but not limited to their violation of mandatory court orders, statutes, regulations, and policies, and all of the other misconduct described herein. By engaging in the acts alleged herein, Defendant and its employees failed to act with ordinary care and breached their duty of care to Plaintiffs.

196.     As a direct and proximate result of Defendant and its employees' negligent and grossly negligent conduct towards Plaintiffs, they suffered serious emotional distress.

197.    Under the FTCA, the United States is liable to Plaintiffs for negligent infliction of emotional distress.

## COUNT 3—NEGLIGENCE

198.    Plaintiffs reallege the foregoing paragraphs, 1 through 188 and incorporate them herein by this reference.

199.    Defendant and its employees referenced above had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause unnecessary harm or injury. Defendant and its employees also had mandatory duties of care, including but not limited those imposed by the United States Constitution, mandatory court orders, consent decrees, statutes, and agency standards, policies, and regulations.

200.    By engaging in the acts described above, Defendant and its employees breached their duties of care by failing to exercise the degree of care that a reasonable person under similar circumstances would employ to protect Plaintiffs from harm, or by engaging in conduct constituting a want of even scant care or an extreme departure from the ordinary standard of conduct.

201.    As a direct and proximate result of the referenced conduct, Plaintiffs suffered substantial damages.

202.    Under the FTCA, the United States is liable to Plaintiffs for negligence.

## COUNT 4—INTENTIONAL INTERFERENCE WITH PARENTAL CONSORTIUM BY PERSON WITHOUT RIGHT OF CUSTODY

203.    Plaintiffs reallege the foregoing paragraphs, 1 through 188 and incorporate them herein by this reference.

204.    Knowing that Ms. R.H. did not consent, Defendant and its employees referenced above abducted and compelled J.M.R. and S.M.R., who were then minors, to leave the care and custody of Ms. R.H., who was legally entitled to custody as their parent. Defendant and its employees intended to deprive Ms. R.H. of custody over J.M.R. and S.M.R. without Ms. R.H.'s consent.

205.     As a direct and proximate result of Defendant and its employees' conduct, Plaintiffs suffered severe emotional trauma and substantial damages.

206.     Under the FTCA, the United States is liable to Plaintiffs for intentional interference with the parent-child relationship.

## COUNT 5—NEGLIGENT SUPERVISION

207.     Plaintiffs reallege the foregoing paragraphs, 1 through 188 and incorporate them herein by this reference.

208.     Defendant and its employees referenced above had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause unnecessary harm or injury. Defendant and its employees in supervisory roles at DHS and HHS have a duty to properly supervise CBP, USBP, and ORR agents, as well as any subcontractors of those agents.

209.     Because Defendant's employees involved in all alleged actions herein lacked proper supervision, they engaged in the conduct described above, which caused Plaintiffs to suffer severe emotional distress and injury.

210.     CBP, USBP, and ORR's failure to adequately supervise its own direct employees caused severe emotional distress to Plaintiffs, physical ailments, inhumane treatment, and unlawfully prolonged separation as a direct and proximate result.

211.     Defendant had supervisorial positions over employees within DHS and HHS, as well as their subcontractors, and had prior knowledge of their propensity to engage in the conduct described herein. Defendant knew or should have known that retaining these employees created a particular risk or hazard of harm to migrant families.

212.     As a direct and proximate result of Defendant's conduct, namely its failure to supervise its employees, Plaintiffs have in fact suffered and continue to suffer severe emotional distress.

213.     Under the FTCA, the United States is liable to Plaintiffs for negligent supervision.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court assume jurisdiction over this action and issue a judgment granting Plaintiffs:

1.      Compensatory damages;

2.      Attorneys' fees and costs as allowable by law, including by the Equal Access to Justice Act, 28 U.S.C. § 2412; and

3.      Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

FTCA claims are tried to the bench. 28 U.S.C. § 2402. Plaintiffs demand a jury trial on any claims that are, at the time of trial, triable by jury, whether because of a change of law or an amendment to the pleadings.

Dated: November 9, 2023        Respectfully submitted,

IMMIGRANTS' RIGHTS CLINIC


*/s/ Lisa Weissman-Ward*
Lisa Weissman-Ward
Jayashri Srikantiah


IMMIGRANT LEGAL DEFENSE


*/s/ Claudia Valenzuela*
Claudia Valenzuela
Jessica Zhang

*Attorneys for Plaintiffs*

## **Attestation Pursuant to Civil L.R. 5-1(i)(3)**

As the filer of this document, I attest that concurrence in the filing was obtained from the other

signatory.

Dated: November 9, 2023

*/s/ Lisa Weissman-Ward*
Lisa Weissman-Ward
*Attorney for Plaintiffs*