Lisa Weissman-Ward (CA SBN 298362)
Jayashri Srikantiah (CA SBN 189556)
IMMIGRANTS' RIGHTS CLINIC
Mills Legal Clinic at Stanford Law School
Crown Quadrangle, 559 Nathan Abbott Way
Stanford, California 94305-8610
Telephone: (650) 724-7396
Facsimile: (650) 723-4426
lweissmanward@law.stanford.edu
jsrikantiah@law.stanford.edu

Claudia Valenzuela*
Jessica Zhang*
IMMIGRANT LEGAL DEFENSE
1301 Clay St., #70010
Oakland, CA 94612
Telephone: (510) 519-1231
Facsimile: (510) 890-3101
claudia@ild.org
jessica@ild.org

*Attorneys for Plaintiffs*

*Pro hac vice applications forthcoming*

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| Ms. R.H.; S.M.R., a minor child; J.M.R., a minor child, | Case No. 5:23-cv-5793-BLF |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |
| v. | |
| UNITED STATES OF AMERICA, | Date: October 31, 2024<br>Time: 9:00 am<br>Dept.: 1<br>Judge: Hon. Beth Labson Freeman |
| Defendant. | Trial Date: Not yet set |

1

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ........................................................................................................1

II.    FACTUAL BACKGROUND.......................................................................................2

III.   LEGAL STANDARD .................................................................................................4

IV.   ARGUMENT...............................................................................................................5

    A.   Because Plaintiffs' Tort Claims Are Cognizable Under the FTCA, Defendant's Motion to Dismiss Should Be Denied ...........................................................................5

        1.   Plaintiffs Satisfy the Private Person Analogue Requirement ...................................5

        2.   The Discretionary Function Exception Does Not Bar Plaintiffs' Claim for Negligent Supervision ............................................................................................7

        3.   Defendant's Reliance on the Foreign Country Exception Misapprehends Plaintiffs' Claim Regarding Ms. R.H.'s Horrific Ordeal in Mexico That Followed U.S. Border Patrol Agents' Failure to Abide by Their Obligations ........................................................................................................11

        4.   The Independent Contractor Exception Does Not Bar Plaintiffs' Claims Relating to Injuries that J.M.R. and S.M.R. Suffered While in ORR Custody ...................................................................................................................13

    B.   Plaintiffs Stated a Claim for Negligent Infliction of Emotional Distress Under the Appropriate Choice-of-Law Analysis ...............................................................................18

V.    CONCLUSION.........................................................................................................21

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
Case No. 5:23-cv-05793-BLF

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*A.E.S.E. v. United States*, No. 21-cv-0569 RB, 2022 WL 4289930 (D.N.M. Sept. 16, 2022) ..................6

*A.F.P. v. United States*, No. 1:21-cv-00780-DAD, 2022 WL 2704570 (E.D. Cal. July 12, 2022) .......6, 13

*A.P.F. v. United States*, 492 F. Supp. 3d 989 (D. Ariz. 2020) .......................................................... passim

*Arce v. United States*, 899 F.3d 796 (9th Cir. 2018)................................................................................12

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................................................5

*B.A.D.J. v. United States*, No. CV-21-00215-PHX, 2022 WL 11631016 (D. Ariz. Sept. 30, 2022) .........6

*Barnes v. County of Nassau*, 487 N.Y.S.2d 827 (N.Y. App. Div. 1985)...................................................15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................................................5

*Bhuiyan v. United States*, 772 F. App'x 564 (9th Cir. 2019).....................................................................7

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009) ................................................................5

*Brockett v. Kitchen Boyd Motor Co.*, 24 Cal. App. 3d 87 (Cal. Ct. App. 1972).......................................15

*C.A. v. William S. Hart Union High Sch. Dist.*, 53 Cal. 4th 861 (Cal. 2012) ...........................................15

*C.M. v. United States*, 19-cv-05217, 2020 WL 1698191 (D. Ariz. Mar. 30, 2020) ...................................7

*Camozzi v. Roland/Miller & Hope Consulting Grp.*, 866 F.2d 287 (9th Cir. 1989) ...................................9

*Doe v. United States*, 419 F.3d 1058 (9th Cir. 2005).................................................................................5

*Dugard v. United States*, 835 F.3d 915 (9th Cir. 2016) .............................................................................5

*E.S.M. v. United States*, No. CV-21-00029-TUC, 2022 WL 11729644 (D. Ariz. Oct. 20, 2022) .............6

*Edison v. United States*, 822 F.3d 510 (9th Cir. 2016) .........................................................13, 14, 15, 17

*Elgamal v. Bernacke*, 714 F. App'x 741 (9th Cir. 2018)............................................................................7

*Evard v. S. Cal. Edison*, 153 Cal. App. 4th 137 (Cal. Ct. App. 2007)......................................................18

*F.R. v. United States*, No. CV-21-00339-PHX, 2022 WL 2905040 (D. Ariz. July 22, 2022) ...................6

*Fuentes-Ortega v. United States*, 640 F. Supp. 3d 878 (D. Ariz. 2022)....................................................6

*Galvan v. Walt Disney Parks & Resorts, U.S., Inc.*, 425 F. Supp. 3d 1234 (C.D. Cal. 2019)..................21

*Giraldo v. Cal. Dept. of Corr. & Rehab.*, 168 Cal. App. 4th 231 (Cal. Ct. App. 2008)............................15

*Gutierrez v. Collins*, 583 S.W. 2d 312 (Tex. 1979) ................................................................................19

*I.T. v. United States*, No. 22-cv-05333-DMR, 2023 WL 10354060 (N.D. Cal. Feb. 24, 2023)..................6

*In re Consol. U.S. Atmospheric Testing Litig.*, 820 F.2d 982 (9th Cir. 1987).......................................9, 10

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981 (9th Cir. 2008) ..............5

*Indian Towing Co. v. United States*, 350 U.S. 61 (1955) ...................................................................5, 7

*Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018 (9th Cir. 1989) ............................................9

*LaBarge v. Mariposa Cnty.*, 798 F.2d 364 (9th Cir. 1986)..................................................................5

*Lacey v. United States*, No. 13-132, 2013 WL 4759270 (D. Ariz. Sept. 4, 2013)....................................20

*Liranzo v. United States*, 690 F.3d 78 (2d Cir. 2012)..........................................................................6

*M.A.N.H. v. United States*, 5:23-cv-00372-JGB (C.D. Cal. Sept. 22, 2023) ............................................6

*Marlys Bear Medicine v. United States*, 241 F.3d 1208 (9th Cir. 2001) ...........................................8, 9, 10

*Mazur v. United States*, 957 F. Supp. 1041 (N.D. Ill. 1997) ................................................................7

*McCall v. U.S. Dept. of Energy*, 914 F.2d 191 (9th Cir. 1990) ............................................................9

*Nunez Eueeda v. United States*, No. 2:20-cv-10793-VAP, 2021 WL 4895748 (C.D. Cal. Apr. 27, 2011) 6

*O'Toole v. United States*, 295 F.3d 1029 (9th Cir. 2002)....................................................................4

*Prescott v. United States*, 973 F.2d 696 (9th Cir. 1992)......................................................................4

*Quintero Perez v. United States*, 8 F.4th 1095 (9th Cir. 2021)............................................................12

*Regents of Univ. of Cal. v. Superior Ct.*, 4 Cal. 5th 607 (Cal. 2018)....................................................15

*Richards v. United States*, 369 U.S. 1 (1962) ................................................................................18

*Rodriguez v. United States*, No. 2:22-cv-02845-JLS-AFM, 2022 WL 19237182 (C.D. Cal. Dec. 22, 2022) ...........................................................................................................................19, 20, 21

*Ryan v. ICE*, 974 F.3d 9 (1st Cir. 2020) ..........................................................................................7

*S.H. by Holt v. United States*, 853 F.3d 1056 (9th Cir. 2017) .......................................................12, 13

*Sanchez v. New York*, 827 N.Y.S.2d 338 (N.Y. App. Div. 2007).........................................................16

*Sea Air Shuttle Corp. v. United States*, 112 F.3d 532 (1st Cir. 1997) ...................................................7

*Sean M. v. City of New York*, 795 N.Y.S.2d 539 (N.Y. App. Div. 2005)...............................................15

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)..........................................................................11, 12

*Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057 (N.D. Cal. 2017) ........................................................5

1    *Tonelli v. United States*, 60 F.3d 492 (8th Cir. 1995)...................................................................8

2    *Torrington Co. v. Stutzman*, 46 S.W.3d 829 (Tex. 2000) .........................................................19

3    *United States v. Gaubert*, 499 U.S. 315 (1991) .........................................................................7

4    *United States v. Mitchell*, 445 U.S. 535 (1980) .........................................................................4

5    *United States v. Muniz*, 374 U.S. 150 (1963).............................................................................5

6    *Vaughan v. Northup*, 40 U.S. 1 (1841) .....................................................................................20

7    *Vickers v. United States*, 228 F.3d 944 (9th Cir. 2000) ............................................................8

8    *Walding v. United States*, 955 F. Supp. 2d 759 (W.D. Tex. 2013)...........................................13

9    *Whisnant v. United States*, 400 F.3d 1177 (9th Cir. 2005).......................................................9

10    *Wilbur P.G. v. United States*, No. 4:21-cv-04457-KAW, 2022 WL 3024319 (N.D. Cal. May 10, 2022)..6

11    *Wong v. Tai Jing*, 189 Cal. App. 4th 1354 (Cal. Ct. App. 2010)...............................................21

12    *Xue Lu v. Powell*, 621 F.3d 944 (9th Cir. 2010) ...................................................................5, 6

13    **Statutes**

14    28 U.S.C § 1346(b) ...................................................................................................................18

15    28 U.S.C. § 2680(k) .............................................................................................................11, 12

16    31 U.S.C. § 6305(2) ..................................................................................................................16

17    Cal. Welf. & Instit. Code § 16001.9(a) ....................................................................................14

18    N.Y. Soc. Servs. Law § 395 .....................................................................................................15

19    N.Y. Soc. Servs. Law § 398 .....................................................................................................15

20    N.Y. Soc. Servs. Law § 400 .....................................................................................................15

21    **Other Authorities**

22    Cal. Civ. Jury Instr. (BAJI) § 12.80 .........................................................................................21

23    N.Y. Off. Child. & Fam. Servs., *New York State Bill of Rights for Children and Youth in Foster Care*,

24      OCFS-Pub2001 (2023), https://ocfs.ny.gov/publications/Pub2001/OCFS-Pub2001.pdf ....................16

25    ORR Unaccompanied Children Program Policy Guide, https://www.acf.hhs.gov/orr/policy-

26      guidance/unaccompanied-children-program-policy-guide .............................................................10, 17

27

28

1

**Treatises**

2
Restatement (Second) of Conflict of Laws (1971) .......................................................19

3
Restatement (Second) of Torts § 424 ...........................................................................18

4

**Regulations**

5
45 C.F.R. § 630.620 ......................................................................................................16

6
48 C.F.R. § 2.101 ..........................................................................................................16

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.      INTRODUCTION

This is an action under the Federal Torts Claims Act (FTCA) in which Plaintiffs, Ms. R.H. and her two sons, J.M.R. and S.M.R., seek redress for their forcible separation by U.S. government employees in October of 2020, at a time when both J.M.R. and S.M.R. were minors, for the subsequent placement of J.M.R. and S.M.R. in federal government custody, and for the continuation of Plaintiffs' separation by U.S. government employees for nearly five months after Ms. R.H.'s wrongful expulsion to Mexico. Employees of the U.S. agencies involved, namely U.S. Customs and Border Protection (CBP) and Office of Refugee Resettlement (ORR), had clear duties to Plaintiffs under the U.S. Constitution, applicable statutes and regulations, and mandatory agency directives. Many of these duties were reinforced by additional agency guidance in the wake of one of the most troubling chapters in U.S. immigration history, the former Trump administration's "Zero Tolerance" policy, in which thousands of parents were forcibly separated from their children by the U.S. government. Indeed, the cruel practice of family separation under the Zero Tolerance policy had officially ended in the face of public outrage by the time that U.S. Border Patrol agents separated Ms. R.H., J.M.R., and S.M.R. Despite clear mandates to protect family units and otherwise provide adequate care for "unaccompanied minors," U.S. government employees either ignored or simply failed to meet those obligations in the family's case. The U.S. government's willful and negligent failure to abide by its obligations as to Plaintiffs constitutes tortious conduct that has resulted in indisputable harm to Plaintiffs.

Defendant does not dispute that Plaintiffs have stated legal claims for intentional infliction of emotional distress, negligence, and intentional interference with parental consortium. Further, Defendant does not contest the crux of the legal questions inherent in Plaintiffs' claims: that U.S. government employees violated clear mandates under the U.S. Constitution, statutes, and agency regulations and directives, to forcibly and unjustifiably separate Ms. R.H. from her sons, resulting in the family's separation for nearly five months, during which J.M.R. and S.M.R. received inadequate care. In its Motion to Dismiss, Defendant raises exceptions to the FTCA – the private person analogue, foreign country exception, and the discretionary function exception as to Plaintiffs' claim of negligent supervision – to argue that this Court should dismiss Plaintiffs' claims. Contrary to the government's contention, however,

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
Case No. 5:23-cv-05793-BLF

none of these exceptions apply here. Defendant also erroneously argues that Plaintiffs' negligent infliction of emotional distress claim should be dismissed because Texas law does not recognize such a tort. However, Defendant's argument is based on a misapplied choice-of-law analysis. For the reasons discussed here, this Court should deny Defendant's motion and permit Plaintiffs' claims to proceed in full.

## II.    FACTUAL BACKGROUND

In April of 2018, the former Trump administration publicly implemented a "Zero Tolerance" policy, purporting to prioritize the prosecution of migrants arriving in the United States for unlawful entry. Compl. ¶ 35. Under this policy, U.S. government officials began forcibly separating parents from their minor children when encountered together at the border, for the alleged purpose of criminally prosecuting parents. *Id.* This policy of family separation was challenged in *Ms. L. v. ICE*, filed in federal district court in the Southern District of California, which found as a threshold matter that the families had stated a cognizable legal claim based on the constitutional right to family integrity, under the U.S. constitution. *Id*. ¶ 36. On June 26, 2018, the district court enjoined the practice, except in a narrow and specific set of circumstances. *Id*. ¶ 38. In the wake of public outcry and the ongoing federal class-action litigation in *Ms. L.*, former President Trump officially rescinded the policy on June 20, 2018. *Id.* ¶ 37.

Following the rescission of family separation as a practice, and the injunction issued in *Ms. L.*, relevant U.S. governmental agencies issued further directives, clarifying already existing employees' obligations when encountering families. *See id.* ¶¶ 46–63. For example, not only did the *Ms. L.* court make clear that U.S. government bore the "burden to prove lack of parentage before making a separation decision," but when making such a decision, the U.S. government and its employees were required to "consider all available reliable evidence," and were required to "conduct DNA testing before separating an adult from a child based on parentage concerns." *Id*. ¶¶ 44, 48–50. Furthermore, where individuals claimed to be the parent or legal guardian of the child with whom they entered, CBP employees were under a mandatory obligation to document every family unit apprehension, and in the event of separation, every separation and the reasons for the separation. *Id*. ¶¶ 60–62. Any decision to separate a family unit required approval by a USBP watch commander. *Id*. ¶ 52.

Ms. R.H., J.M.R., and S.M.R. fled El Salvador after their husband and father was killed in front of them by gang members. *Id*. ¶¶ 81, 83. J.M.R. was fourteen and S.M.R. was eleven. *Id*. ¶ 83. Just before leaving El Salvador, Ms. R.H. had received abdominal surgery and was still recovering from the procedure. *Id*. ¶ 90. U.S. government employees initially encountered Ms. R.H., J.M.R., and S.M.R. in Texas on approximately October 10, 2020, at which time Ms. R.H. informed the agents of the family's past persecution and fear of return to El Salvador. *Id*. ¶¶ 84–85. U.S. employees summarily returned the family to Mexico under Title 42, which had been invoked by the Centers for Disease Control and Prevention (CDC) based on the COVID-19 pandemic, and which CBP implemented by summarily expelling individuals encountered along the border except in cases where an individual faces a risk of torture in the country to which they were being expelled. *Id*. ¶¶ 75, 87. Because Plaintiffs feared for their lives in El Salvador, and did not feel safe in Mexico, they again entered the United States into Texas on October 13, 2020. *Id*. ¶¶ 88–89. On this second occasion, state law enforcement apprehended them and turned them over to the custody of CBP. *Id*. ¶¶ 91–92.

Plaintiffs' claims stem from this second encounter with two Border Patrol agents. Upon encountering the family, the agents accused Ms. R.H. of presenting false documentation and of trafficking the boys. *Id*. ¶¶ 99–100. At no time during the encounter did the agents engage in the requirements for assessing the validity of a family unit. *Id*. ¶¶ 103–05. This included conducting DNA testing, which Ms. R.H. begged the agents to do. *Id*. ¶ 103. Further, the agents refused to provide Ms. R.H. with medical care despite an openly bleeding wound from her surgery on her stomach. *Id*. ¶¶ 90, 108. The agents forcibly separated the family and expelled Ms. R.H. to Mexico alone. *Id*. ¶¶ 110–11, 113. The agents then incorrectly recorded encountering J.M.R. and S.M.R. alone, without mention of Ms. R.H. *Id*. ¶¶ 120–22. From that night on, the family remained separated for nearly five months, during significant periods of which the children and Ms. R.H. did not know where the other was, or whether they were safe or alive. *Id*. ¶¶ 131, 142, 163. J.M.R. and S.M.R. were moved among shelters, despite ORR's knowledge of a family friend who could serve as a sponsor, and eventually placed in federal foster care, where they endured abusive conditions. *Id*. ¶¶ 145–49. During this period, Ms. R.H. was held captive by unknown individuals who may have been affiliated with Mexican law enforcement, for approximately one month,

where she was sexually assaulted and tortured daily. *Id*. ¶¶ 132–37 After her captors left her and others in the desert for dead, Ms. R.H. managed to flee. *Id*. ¶¶ 137–39. She then attempted to reunify with her sons on approximately four occasions, presenting herself at U.S. ports of entry, begging to be reunited with her sons, and expressing fear of returning to El Salvador and Mexico, including describing what had occurred to her in Mexico. *Id*. ¶ 141. Each time, CBP agents turned her away. *Id*.

On approximately January 20, 2021, Ms. R.H. applied for humanitarian parole with CBP, seeking parole based on her wrongful separation from her children and need to enter the United States to reunify with them. *Id*. ¶ 159. DHS employees approved that application and paroled Ms. R.H. into the United States on February 25, 2021. *Id*. ¶ 160. Ms. R.H., J.M.R., S.M.R. were subsequently reunited in California, after almost five months of separation. *Id*. ¶¶ 162–63. Because of Defendant's actions, including forcibly and unlawfully separating Plaintiffs, failing to provide Ms. R.H. necessary medical care, wrongfully expelling Ms. R.H. to Mexico, failing to properly document the encounter with Plaintiffs as a family unit, unlawfully processing J.M.R. and S.M.R. as unaccompanied minors, failing to keep J.M.R. and S.M.R. in the least restrictive custodial setting and safe, and wrongfully keeping the family separated for nearly five months, Ms. R.H., J.M.R., and S.M.R. have suffered and continue to suffer numerous physical and emotional injuries. *See id.* ¶¶ 163–88.

## III.   LEGAL STANDARD

Plaintiffs' causes of action arise under the FTCA. While the U.S. government is generally immune from liability absent its consent, *United States v. Mitchell*, 445 U.S. 535, 538 (1980), the FTCA provides that consent "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b)(1). The FTCA's waiver of sovereign immunity contains several exceptions. Because the FTCA is a remedial statute, those exceptions must be read narrowly, *O'Toole v. United States*, 295 F.3d 1029, 1037 (9th Cir. 2002), and the United States bears the burden of proving they apply, *Prescott v. United States*, 973 F.2d 696, 702 (9th Cir. 1992).

On a motion to dismiss, "the court must construe the complaint in the light most favorable to the plaintiff, taking all her allegations as true and drawing all reasonable inferences from the complaint in her

favor." *Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005). The "complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1081 (N.D. Cal. 2017) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009)).

Defendant moves to dismiss under Rule 12(b)(1) and 12(b)(6). Under Rule 12(b)(1), dismissal for lack of subject matter jurisdiction is only appropriate "if the complaint, considered in its entirety, on its face fails to allege facts sufficient to establish subject matter jurisdiction." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 984–85 (9th Cir. 2008). Under Rule 12(b)(6), a complaint cannot be dismissed if it contains sufficient factual assertions, when accepted as true, "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). Evaluation of a complaint under Rule 12(b)(6) is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## IV. ARGUMENT

### A. Because Plaintiffs' Tort Claims Are Cognizable Under the FTCA, Defendant's Motion to Dismiss Should Be Denied

#### 1. Plaintiffs Satisfy the Private Person Analogue Requirement

The Court should reject Defendant's argument that Plaintiffs' claims do not satisfy the FTCA's private analogue requirement. The FTCA requires that Plaintiffs show that "a private individual under like circumstances would be liable under state law." *United States v. Muniz*, 374 U.S. 150, 153 (1963). Defendant claims that there is no private person analogue because only the federal government has the authority to enforce federal immigration laws. Dkt. 34 at 9. Defendant's argument is too narrow a reading of the private person analogue and, if adopted, would serve to essentially preclude any claims against the U.S. government. Indeed, the Supreme Court has rejected such a narrow reading of the requirement. *Indian Towing Co. v. United States*, 350 U.S. 61, 64 (1955) (holding that private person analogue should not be read "as excluding liability in the performance of activities which private persons do not perform"). Instead, a plaintiff satisfies the private person analogue by alleging "the most reasonable analogy." *Dugard v. United States*, 835 F.3d 915, 919 (9th Cir. 2016) (quoting *LaBarge v. Mariposa Cnty.*, 798 F.2d 364, 367 (9th Cir. 1986)); *see Xue Lu v. Powell*, 621 F.3d 944, 948 (9th Cir. 2010) ("Analogy not identity

of circumstance is key.”); *A.P.F. v. United States*, 492 F. Supp. 3d 989, 994 (D. Ariz. 2020) (“Recognizing that the federal government could never be exactly like a private actor, the Ninth Circuit only requires courts to find the most reasonable analogy to private tortious conduct.”) (internal quotation marks omitted).

Plaintiffs’ claims similarly satisfy the private person analogue requirement. In arguing that the private person analogue is not satisfied here, Defendant mischaracterizes the relevant facts. Plaintiffs are not broadly challenging the government’s enforcement of immigration laws. Rather, the tortious conduct underlying Plaintiffs’ claims stems from the forcible and prolonged separation of Ms. R.H. from her children by government employees. These actions satisfy the elements for the torts Plaintiffs allege under California law.[1] Defendant does not seriously dispute this.

Nor could it. Multiple courts considering FTCA claims in the immigration context have rejected Defendant’s contention that there is no private person analogue “[b]ecause only the federal government has the authority to enforce federal immigration laws.” Dkt. 34 at 9; *see Xue Lu*, 621 F.3d at 947–50; *Liranzo v. United States*, 690 F.3d 78, 94–96 (2d Cir. 2012). In recent decisions involving wrongful family separation claims under the FTCA, courts have likewise repeatedly rejected Defendant’s exact same argument. *See, e.g.*, Order at 21–22, *M.A.N.H. v. United States*, 5:23-cv-00372-JGB (C.D. Cal. Sept. 22, 2023), ECF No. 51; *I.T. v. United States*, No. 22-cv-05333-DMR, 2023 WL 10354060, at *8–9 (N.D. Cal. Feb. 24, 2023); *Fuentes-Ortega v. United States*, 640 F. Supp. 3d 878, 884–85 (D. Ariz. 2022); *E.S.M. v. United States*, No. CV-21-00029-TUC, 2022 WL 11729644, at *2–3 (D. Ariz. Oct. 20, 2022); *B.A.D.J. v. United States*, No. CV-21-00215-PHX, 2022 WL 11631016, at *4–5 (D. Ariz. Sept. 30, 2022); *A.E.S.E. v. United States*, No. 21-cv-0569 RB, 2022 WL 4289930, at *14 (D.N.M. Sept. 16, 2022); *F.R. v. United States*, No. CV-21-00339-PHX, 2022 WL 2905040, at *3 (D. Ariz. July 22, 2022); *A.F.P. v. United States*, No. 1:21-cv-00780-DAD, 2022 WL 2704570, at *9–10 (E.D. Cal. July 12, 2022); *Wilbur P.G. v. United States*, No. 4:21-cv-04457-KAW, 2022 WL 3024319, at *5 (N.D. Cal. May 10, 2022); *Nunez Euceda v. United States*, No. 2:20-cv-10793-VAP, 2021 WL 4895748, at *4 (C.D. Cal. Apr. 27, 2011); *A.P.F.*, 492

---

[1] For reasons outlined *infra*, § IV.B., under Texas choice-of-law analysis, the Court should apply the law of California to the torts alleged by Plaintiffs.

PLAINTIFFS’ OPPOSITION TO DEFENDANT’S MOTION TO DISMISS
Case No. 5:23-cv-05793-BLF

F. Supp. 3d at 994–95; *C.M. v. United States*, 19-cv-05217, 2020 WL 1698191, at *2 (D. Ariz. Mar. 30, 2020). Defendant's argument is no different here. And the cases Defendant cites are inapposite. *See* Dkt. 34 at 9. Three of the cases Defendant cites concern the adjudication of immigration benefits and naturalization, a factual context that is wholly unrelated to and different from Plaintiffs' claims of forcible and prolonged family separation. *See Elgamal v. Bernacke*, 714 F. App'x 741, 742 (9th Cir. 2018); *Bhuiyan v. United States*, 772 F. App'x 564, 565 (9th Cir. 2019); *Mazur v. United States*, 957 F. Supp. 1041, 1042–43 (N.D. Ill. 1997). *Ryan v. ICE*, 974 F.3d 9 (1st Cir. 2020), dealt with a challenge to Immigration and Customs Enforcement policy under the Administrative Procedures Act, and thus, an altogether different legal query. *Id.* at 14–15. And *Sea Air Shuttle Corp. v. United States*, 112 F.3d 532 (1st Cir. 1997), held that a challenge to the Secretary of Transportation and the Federal Aviation Administration's failure to take enforcement action as part of its regulatory functions vis a vis aviation facilities and air carriers that are out-of-compliance with federal laws and rules had no state law corollary. *Id.* at 536. In so doing, the First Circuit re-emphasized the holding of *Indian Towing*: "[A] peculiarly governmental function does not, of course, necessarily preclude FTCA coverage." *Id.* (citing *Indian Towing*, 350 U.S. at 64–65).

The Court should thus deny Defendant's motion as to the private person analogue.

### 2. The Discretionary Function Exception Does Not Bar Plaintiffs' Claim for Negligent Supervision

Defendant's argument that the discretionary function exception bars Plaintiffs' negligent supervision claims also fails. Plaintiffs allege that Defendant failed to adequately supervise its employees within CBP and ORR, as well as ORR's subcontractors, and that failure to supervise caused its employees to inflict severe emotional distress and physical harm to Plaintiffs. Compl. ¶¶ 207–13. Defendant argues that negligent supervision claims "inherently involve the kind of judgment" barred by the discretionary function exception, Dkt. 34 at 12, which bars claims based on government actions that (1) involve an element of judgment or choice, and (2) involve public policy considerations, *see United States v. Gaubert*, 499 U.S. 315, 322–23 (1991). However, the discretionary function exception does not wholly bar negligent supervision claims. Indeed, even the cases Defendant cites in support of its proposition state only that negligent supervision claims "*usually* involve policy judgments." *Vickers v. United States*, 228

F.3d 944, 950 (9th Cir. 2000) (emphasis added); *see Tonelli v. United States*, 60 F.3d 492, 496 (8th Cir. 1995) (noting issues of supervision "generally involve . . . policy judgment" barred by discretionary function exception, but reversing district court dismissal of negligent supervision claim where there was failure to act after notice of illegal action, which "does not represent a choice based on plausible policy considerations").

Like in *Tonelli v. United States*, cited by Defendant, Dkt. 34 at 12, Plaintiffs' claim of negligent supervision by CBP is not barred by the discretionary function exception under the second prong of the analysis. There was no "plausible policy consideration" in allowing supervised CBP employees to disregard constitutional rights, court orders, clear statutory and regulatory instructions, and agency directives on how to process family units and when family separation is allowed. *See Tonelli*, 60 F.3d at 496. Because supervising CBP employees in a manner that allowed them to violate law has "no plausible policy consideration," the discretionary function exception does not apply to Plaintiffs' negligent supervision claim as to CBP.

Plaintiffs' claim of negligent supervision of ORR contractors also is not barred by the discretionary function exception.[2] The Ninth Circuit has held that the discretionary function exception does not protect the government's failure to ensure compliance with safety standards where the government has explicitly taken responsibility for safety under its contract with a contractor. *See Marlys Bear Medicine v. United States*, 241 F.3d 1208, 1214–15 (9th Cir. 2001). In *Marlys Bear Medicine*, plaintiffs alleged that the government was negligent in supervising, managing, and ensuring safety aspects of a contractor's logging operations. *Id.* at 1214. The contract required the contractor to comply with "prescribed safety practices

---

[2] Defendant argues that "[t]he selection of a contractor to provide custody and care of [unaccompanied minors] is also within ORR's policy-based discretion." Dkt. 34 at 12–13. Plaintiffs do not challenge ORR's selection of its contractors. Rather, Plaintiffs allege that ORR failed to ensure J.M.R. and S.M.R. were placed in the least restrictive setting available and ensure J.M.R. and S.M.R.'s physical and emotional safety and well-being while they remained in ORR's custody, pursuant to statutory and regulatory mandates, their own procedures and policies, the *Flores* settlement agreement, and their cooperative agreement with Abbott House.

and Federal Law" and the governmental agency retained the power to suspend the contract if the contractor failed to do so. *Id.* at 1215. The agency also regularly inspected the site to ensure compliance, pursuant to its own operational manual. *Id.* While the district court found safety monitoring to be a discretionary function, the Ninth Circuit reversed, citing long-standing circuit precedent that did not apply the discretionary function exception to safety monitoring after the government had already "undertaken responsibility for the safety of a project." *See id.* (citing *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1029 (9th Cir. 1989); *Camozzi v. Roland/Miller & Hope Consulting Grp.*, 866 F.2d 287, 290 (9th Cir. 1989); *McCall v. U.S. Dept. of Energy*, 914 F.2d 191, 196 (9th Cir. 1990)). In cases such as this, the Ninth Circuit has held that the exception fails at the second prong of the analysis because of the difference between design and implementation: "[W]e have generally held that the *design* of a course of governmental action is shielded by the discretionary function exception, whereas the *implementation* of that course of action is not." *Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005) (holding government's negligence in keeping commissary grocery store clean, safe, and free of mold does not involve policy judgment). And the Ninth Circuit has made clear that "none of our cases" have suggested that any further development in the second prong of the discretionary function exception analysis "is intended to change our long-held doctrine that safety measures, once undertaken, cannot be shortchanged in the name of policy." *Bear Medicine*, 241 F.3d at 1216–17.

In support of its argument, Defendant cites *In re Consol. U.S. Atmospheric Testing Litig.*, 820 F.2d 982 (9th Cir. 1987), which found that the discretionary function exception barred plaintiffs' claim that the government negligently failed to supervise the contractor's compliance with safety procedures and guidelines established in a "Safety Plan" developed by the agency. *Id.* at 994–96. This case, decided before *Bear Medicine*, does not involve safety guidelines that the agency took responsibility for in the terms of its contract. Rather, the "Safety Plan" was a generalized plan that gave "officials in charge of the tests . . . . discretion to adopt and modify the Plan as necessary to achieve the objectives" of each test. *Id.* at 995. This is unlike the case in *Bear Medicine*, in which the agency had taken responsibility for ensuring *compliance* of set and binding safety standards. Indeed, the plaintiffs in *Atmospheric Testing* relied heavily

on an nondelegable duty argument, rather than an argument that there was no policy decision at all, the basis of the holding in *Bear Medicine. See id.* at 996.

In the present case, the cooperative agreement between ORR and Abbott House similarly agrees that ORR retains responsibility to ensure safety standards are met. Like the agency in *Bear Medicine*, ORR explicitly maintains monitoring responsibilities, through which it "will conduct announced and unannounced monitoring activities throughout the project period." Dkt. 34-1, Exh. A at 25. The purpose of ORR's monitoring is to "ensure compliance with the *Flores* settlement agreement, pertinent federal laws and regulations, and ORR policies and procedures," including the "ORR Policy Guide and relevant procedures." *Id.* Similarly, ORR's policy guide for its unaccompanied children program states that it must conduct monthly visits "to ensure that care providers meet minimum standards for the care" of unaccompanied children and "abide by all Federal and State laws and regulations, . . . ORR policies and procedures, and child welfare standards." ORR Unaccompanied Children Program Policy Guide § 5.5, https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide. ORR monitoring "provides consistent oversight of all components of a care provider's program, including . . . safety and security [and] child protection." *Id.* § 5.5.1. Where programs fail to correct violations, "ORR may discontinue funding, halt placements and remove children from a facility, and/or close programs." *Id.* § 5.5. Thus, like the agency in *Bear Medicine*, ORR, through both its agreement with Abbott House and its own policy guide, clearly maintains responsibility to ensure safety compliance, pursuant to clear safety standards set forth in federal laws and regulations and ORR policies and procedures. Also like the agency in *Bear Medicine*, ORR ensures compliance through clear monitoring obligations and holds the power to terminate the agreement where safety standards are not met. Therefore, ORR is not making policy judgments when supervising for the purposes of safety compliance, but rather, merely implementing precautions that have already been agreed upon. Under the Ninth Circuit's "long-held doctrine that safety measures, once undertaken, cannot be shortchanged in the name of policy," *Bear Medicine*, 241 F.3d at 1216–17, the discretionary function exception does not apply to ORR's negligent supervision of its contractor, Abbott House.

1   For these reasons, Plaintiffs' negligent supervision claims are not barred by the discretionary

2   function exception.

### 3. Defendant's Reliance on the Foreign Country Exception Misapprehends Plaintiffs' Claim Regarding Ms. R.H.'s Horrific Ordeal in Mexico That Followed U.S. Border Patrol Agents' Failure to Abide by Their Obligations

Defendant also fundamentally misapprehends Plaintiffs' allegations regarding Ms. R.H.'s captivity in Mexico. While the month-long captivity that Ms. R.H. endured in Mexico was horrific, Plaintiffs' challenge is to U.S. Border Patrol agents' unlawful and forcible separation of Ms. R.H. from her sons and her wrongful return to Mexico, in conjunction with the unlawful acts that government employees engaged in surrounding and stemming from the separation. All these tortious actions happened on U.S. soil. Plaintiffs do not seek to hold Defendant liable for a "claim arising in a foreign country," Dkt. 34 at 13 (quoting 28 U.S.C. § 2680(k)), and have not alleged such a claim. *See generally* Compl. Because this is not Plaintiffs' claim, the Court should reject Defendant's attempt to shield the government's liability for its own conduct in the United States under the foreign county exception.

Defendant's reliance on *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), is misplaced. In *Sosa*, the Supreme Court had before it the "straightforward" scenario in which the tortious conduct occurred in Mexico: after Mexico refused to extradite the plaintiff to the United States to stand trial for his involvement in the torture of a U.S. Drug Enforcement Administration (DEA) agent, the DEA hired Mexican nationals to abduct the plaintiff in Mexico and forcibly bring him to the United States. *Id.* at 697–98, 701. The plaintiff subsequently brought an FTCA claim against the United States for false arrest. *Id*. at 698. Under these facts, the Supreme Court concluded that the tort of false arrest occurred in Mexico, and thus clearly implicated the foreign country exception under the FTCA. *See id*. at 700–01.

Plaintiffs' facts do not mirror the facts in *Sosa*. Plaintiffs have alleged that the U.S. government – specifically, U.S. Border Patrol agents – unlawfully separated Ms. R.H. and her sons on U.S. soil, in violation of U.S. law, regulations, agency directives, and an injunction by a federal district court. Compl. ¶¶ 89–112. Following this unlawful separation, U.S. Border Patrol agents unlawfully sent Ms. R.H. to Mexico and U.S. government employees unlawfully processed and held J.M.R. and S.M.R. as unaccompanied minors. *Id.* ¶¶ 113–27. CBP employees also denied Ms. R.H. entry when she presented

herself at U.S. ports of entry, alleging imminent danger in Mexico and fear of return to El Salvador, and pleading to be reunited with her children after separation by the U.S. government. *Id.* ¶ 141. Plaintiffs' factual allegations regarding the terrible harm that Ms. R.H. suffered in Mexico, then, serve as relevant context for both Plaintiffs' claims relating to the events surrounding separation and Ms. R.H.'s expulsion from the United States, and for her claims that U.S. officials kept her separated from her sons for nearly five months, despite her repeated attempts to reunite with them by presenting herself to CBP employees at ports of entry.

Thus, the tortious conduct that Plaintiffs allege – the unlawful separation of Ms. R.H. from her sons, her unlawful expulsion from the United States, the unlawful false documentation and processing of J.M.R. and S.M.R. as unaccompanied minors, and the repeated failure to reunite Ms. R.H. with her children for nearly five months – that form the claims alleged here – intentional infliction of emotional distress, negligent infliction of emotional distress, negligence, intentional interference with parental consortium, and negligent supervision – without question originated in and occurred within the United States. The relevant inquiry for the foreign country exception looks to where the "claim aris[es]," 28 U.S.C. § 2680(k), and "a claim arises where the harm occurs," *Sosa*, 542 U.S. at 711. The Ninth Circuit has made clear that "an injury 'occurs' where it is first suffered, even if a negligent act later results in further or more serious harm." *S.H. by Holt v. United States*, 853 F.3d 1056, 1061–62 (9th Cir. 2017); *see Quintero Perez v. United States*, 8 F.4th 1095, 1101 n.1 (9th Cir. 2021) ("Following *Sosa* . . . we held that an injury is suffered where the harm first impinges upon the body.") (internal quotations omitted). Indeed, the Ninth Circuit has even rejected the government's invocation of the foreign country exception in a case where the government deported the plaintiff from the United States to Mexico, stating that the "injury clearly occurred in the United States when the government removed him from [California] and deported him to Mexico." *Arce v. United States*, 899 F.3d 796, 801 n.5 (9th Cir. 2018). For the same reasons, Plaintiffs' injuries in the present case clearly occurred when U.S. Border Patrol agents unlawfully separated Ms. R.H. from J.M.R. and S.M.R., unlawfully expelled her to Mexico, unlawfully processed J.M.R. and S.M.R. as unaccompanied minors, and unlawfully refused her requests to be reunited with them, all of which indisputably occurred on U.S. soil. Thus, the foreign country exception cannot apply,

even if these acts "later result[ed] in further or more serious harm" outside of the United States. *S.H.*, 853 F.3d at 1061–62.

Given these facts, the Court should reject Defendant's argument that the foreign country exception is in any manner implicated in Plaintiffs' claims.

### 4. The Independent Contractor Exception Does Not Bar Plaintiffs' Claims Relating to Injuries that J.M.R. and S.M.R. Suffered While in ORR Custody

Defendant likewise incorrectly invokes the independent contractor exception as to Plaintiffs' claims. The FTCA's independent contractor exception "protect[s] the United States from vicarious liability for the negligent acts of its independent contractors." *Edison v. United States*, 822 F.3d 510, 518 (9th Cir. 2016). Here, Plaintiffs' claims relating to injuries that J.M.R. and S.M.R. suffered while in ORR custody seek recovery for harms resulting from U.S. government agents' own acts and omissions, not those of independent contractors. *See* Compl. ¶¶ 127–57; *Edison*, 822 F.3d at 518 ("The independent contractor exception . . . has no bearing on the United States' FTCA liability for its *own* acts or omissions."). Defendant incorrectly attempts to recast Plaintiffs' claims as against Abbott House, rather than against the federal government, as Plaintiffs have pled. *See* Dkt. 34 at 14–15.

As Plaintiffs' allegations make clear, the government's wrongful separation of J.M.R. and S.M.R. from Ms. R.H. and incorrect designation of J.M.R. and S.M.R. as unaccompanied minors in the first instance caused the harm J.M.R. and S.M.R. endured after being placed in federal foster care. Courts have previously rejected similar attempts by Defendant to apply the independent contractor exception in family separation cases where plaintiffs suffered harm in privately contracted facilities while in ORR custody. In *A.P.F.*, an FTCA case alleging tortious conduct on the basis of unlawful family separation, the court held that the abuse plaintiffs suffered while held in foster care facilities that contracted with the United States was sufficiently "trace[d] . . . back to CBP officials' separation of Plaintiff families" as the proximate cause, and rejected the independent contractor exception. 492 F. Supp. 3d at 997 ("Had the families remained intact, no foster-ca[r]e abuse would have occurred."); *see id.* at 998 (distinguishing and refusing to apply *Walding v. United States*, 955 F. Supp. 2d 759 (W.D. Tex. 2013), "on which the United States principally relies," as it does here, Dkt. 34 at 14). Other courts have reached the same conclusion. *See, e.g.*, *A.F.P.*, 2022 WL 2704570, at *17–18 (holding independent contractor exception does not apply

where plaintiffs alleged that "government's conduct of forcibly separating plaintiffs was a direct and proximate cause of the harm" suffered while in ORR custody). Here too, Plaintiffs' alleged injuries, including those suffered while in ORR custody, "trace . . . back to CBP officials' separation of" Plaintiffs, as well as CBP's subsequent erroneous designation of J.M.R. and S.M.R. as unaccompanied minors. *A.P.F.*, 492 F. Supp. 3d at 997. Accordingly, the independent contractor exception does not apply in this case.

Even if this Court does not agree with the decisions in prior family separation cases, the independent contractor exception nonetheless does not apply because Plaintiffs do not seek to hold Defendant vicariously liable for the acts and omissions of Abbott House, but rather, for ORR's own acts and omissions. Contrary to Defendant's assertion, the government cannot shield itself based on the mere fact that it delegated duties to Abbott House. *Edison*, 822 F.3d at 518 ("[A] determination that the United States has declined to exercise control over the day-to-day operations of its contractor is not the end of the analysis."). Rather, the Court must also consider whether Plaintiffs "have alleged a separate nondelegable or undelegated duty, which the United States could be held directly liable for breaching." *Id.* To determine whether such a duty exists, the Ninth Circuit applies a three-part test that considers: (1) whether applicable state law would impose a duty of care on a private individual in similar circumstances; (2) whether the United States retained any portion of those duties pursuant to its contract or the parties' actions; and (3) even if the United States did not retain any duties pursuant to a contract, whether any of those duties are nondelegable under state law. *See id*. at 519.

Applying this three-part test to Plaintiffs' claims, the independent contractor exception does not shield Defendant from liability here. As noted by both parties, ORR is tasked by Congress with the care of unaccompanied minors in its custody pursuant to statute, regulations, and agency directives, as well as under the *Flores* settlement agreement. Dkt. 34-1 ¶ 2; *see* Compl. ¶¶ 67–71. California law recognizes that foster care providers have a duty of care as to children in their custody. *See* Cal. Welf. & Instit. Code § 16001.9(a) (codifying the rights of children placed in foster care, including the right "[t]o live in a safe, healthy, and comfortable home where they are treated with respect," "[t]o be placed in the least restrictive setting possible, and "[t]o not be locked in any portion of their foster care placement"); *see also Brockett*

*v. Kitchen Boyd Motor Co.*, 24 Cal. App. 3d 87, 89 (Cal. Ct. App. 1972) ("In this state a presumption of negligence arises from the violation of a statute which was enacted to protect a class of persons of which the plaintiff is a member against the type of harm which the plaintiff suffered as a result of the violation of the statute.") (citations omitted). Additionally, this duty is further bolstered by California's recognition of "a special relationship . . . where the plaintiff is particularly vulnerable and dependent upon the defendant who, correspondingly, has some control over the plaintiff's welfare." *Giraldo v. Cal. Dept. of Corr. & Rehab.*, 168 Cal. App. 4th 231, 245 (Cal. Ct. App. 2008) (internal quotation omitted); *see Edison*, 822 F.3d at 521. This includes a duty of care by a jailer to protect a prisoner, *Giraldo*, 168 Cal. App. 4th at 246–51; *Edison*, 822 F.3d at 521–22 (applying duty in FTCA case even where federal prison run by private contractor), or by a school district to protect its students, *Regents of Univ. of Cal. v. Superior Ct.*, 4 Cal. 5th 607, 624 (Cal. 2018) (citing *C.A. v. William S. Hart Union High Sch. Dist.*, 53 Cal. 4th 861, 869 (Cal. 2012)), from harm by third parties. The same reasoning underlying the duty's application to the "special relationship" between jailer and prisoner similarly extends to children in the government's custody in a foster-care setting:

> Prisoners are vulnerable. And dependent. Moreover, the relationship between them is protective by nature, such that the jailer has control over the prisoner, who is deprived of the normal opportunity to protect himself from harm inflicted by others. This, we conclude, is the epitome of a special relationship . . . .

*Giraldo*, 168 Cal. App. 4th at 250–51. Accordingly, a duty of care exists between the government and the children it takes into its custody and care under California law.

Under the appropriate choice-of-law analysis, *see infra* § IV.B., California law applies to this question. However, even under New York law, the duty of care as to children in foster care is also clearly recognized. *See Sean M. v. City of New York*, 795 N.Y.S.2d 539, 549 (N.Y. App. Div. 2005) ("[T]here is no question that the City was subject to statutory duties to safeguard plaintiff children while they were entrusted to the care of foster parents . . . ."); *Barnes v. County of Nassau*, 487 N.Y.S.2d 827, 830 (N.Y. App. Div. 1985) ("[T]he duty to care for the welfare of the children is imposed on the county by the State, including the responsibility to place the children in foster homes or other institutions under proper safeguards, to supervise the children while in foster homes, and to remove them from the foster home when necessary.") (citing N.Y. Soc. Servs. Law §§ 395, 398, 400); *see also* N.Y. Off. Child. & Fam.

Servs., *New York State Bill of Rights for Children and Youth in Foster Care*, OCFS-Pub2001 (2023), https://ocfs.ny.gov/publications/Pub2001/OCFS-Pub2001.pdf. New York law also recognizes the same duty owed pursuant to special relationships. *See Sanchez v. New York*, 827 N.Y.S.2d 338, 339 (N.Y. App. Div. 2007) ("Having assumed physical custody of inmates, who cannot protect and defend themselves in the same way as those at liberty can, defendant owes a duty of care to safeguard inmates . . . .") (internal quotation and alterations omitted).

ORR, the custodian for unaccompanied immigrant children, did not delegate its core duty of care pursuant to its cooperative agreement with Abbott House. *See* Dkt. 34-1, Exh. A. Notably, as an initial matter, cooperative agreements are not the same as contracts, and federal statutes and regulations make clear that federal agencies use cooperative agreements when the agency expects to remain substantially involved in the activity contemplated by the agreement. *See, e.g.*, 31 U.S.C. § 6305(2) ("An executive agency shall use a cooperative agreement . . . when . . . substantial involvement is expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement."); 48 C.F.R. § 2.101 ("Contracts do not include grants and cooperative agreements . . . ."); 45 C.F.R. § 630.620 (noting similarity between cooperative agreements and grants, "except that substantial involvement is expected between the Federal agency and the recipient when carrying out the activity contemplated by the award"). Accordingly, ORR's decision to use a cooperative agreement reflects its intention to remain substantially involved in Abbott House's care of children in ORR custody – as is required by ORR's statutory and regulatory mandates. As the agreement outlines, ORR retains significant oversight over its partnership with Abbott House, especially with regards to legal and safety compliance. For example, the agreement requires that Abbott House "submit a detailed project plan of the approach, activities, staffing, and timelines" for approval by ORR, to ensure it is compliant with applicable laws, regulations, ORR policies and procedures, and the *Flores* settlement agreement. *Id.* at 20. The agreement also requires regular consultation between ORR and Abbott House, as well as ORR's "unrestricted access to clear, timely, and accurate information about all aspects of the program." *Id.* Further provisions anticipate that ORR would retain ultimate approval power over decisions crucial to delivery of adequate care to minors, such as reviewing and approving "Sub-awards [to] organizations

providing residential services," and the "additions or hiring of key personnel." *Id*. at 24. Finally, the agreement explicitly leaves ORR with the responsibility "to ensure compliance with the *Flores* settlement agreement, pertinent federal laws and regulations, and ORR policies and procedures" through robust monitoring requirements. *Id*. at 25. These monitoring requirements include both announced and unannounced monitoring activities, desk and on-site monitoring activities and site visits, and setting out consequences for noncompliance. *Id*.

Importantly, ORR's own Unaccompanied Children Program Policy Guide, which is listed explicitly as a source of compliance standards for which ORR monitors under its agreement with Abbott House, *id.*, also reflects that ORR did not intend to relinquish its duty of care via its cooperative agreement with Abbott House. Under ORR's Policy Guide, ORR must "conduct[] monitoring visits at least monthly to ensure that care providers meet minimum standards for the care" of unaccompanied children "and that they abide by all Federal and State laws and regulations, . . . ORR policies and procedures, and child welfare standards." ORR Unaccompanied Children Program Policy Guide § 5.5. ORR monitoring "provides consistent oversight of all components of a care provider's program, including . . . safety and security." *Id.* § 5.5.1. Where a care provider is out of compliance with these requirements, ORR holds the responsibility to issue corrective action findings and require that the care provider resolve its noncompliance. *Id.* § 5.5. ORR can also "discontinue funding, halt placements and remove children from a facility, and/or close programs that fail to address" noncompliance. *Id.* The ORR Policy Guide is clear that "ORR's overall goal is always to ensure the care and safety of unaccompanied . . . children in its custody." *Id.* As is clear from the strong language used to describe ORR's monitoring obligations, ORR has not delegated its duty of care, especially regarding compliance with legally binding standards, even where it has entered an agreement with a care provider like Abbott House. Both the agreement and the ORR Policy Guide are consistent and clear on this point.

Because ORR did not delegate its duty of care to Abbott House, the independent contractor exception does not bar Plaintiffs' claims as to ORR's actions that violated this duty of care. *See Edison*, 822 F.3d at 522 (ending analysis at second step where government did not delegate duty). Even if ORR had tried to delegate its duty of care to Abbott House, California law recognizes that the duty is

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
Case No. 5:23-cv-05793-BLF

nondelegable. *See Evard v. S. Cal. Edison*, 153 Cal. App. 4th 137, 146 (Cal. Ct. App. 2007) ("One who by statute or by administrative regulation is under a duty to provide specified safeguards or precautions for the safety of others is subject to liability to the others for whose protection the duty is imposed for harm caused by the failure of a contractor employed by him to provide such safeguards or precautions.") (quoting Restatement (Second) of Torts § 424 ). At minimum, as the *A.P.F.* court noted, "[t]o the extent the United States argues that the contractors caused Plaintiffs' harm, and not the government, this raises a fact-intensive issue inappropriate for resolution at [the motion to dismiss] stage." *A.P.F.*, 492 F. Supp. 3d at 998.

For these reasons, the independent contractor exception does not bar any of Plaintiffs' claims.

### B. Plaintiffs Stated a Claim for Negligent Infliction of Emotional Distress Under the Appropriate Choice-of-Law Analysis

In its motion to dismiss, Defendant asserts that Plaintiffs fail to state a claim for negligent infliction of emotional distress. Defendant's sole basis for this assertion is that Texas does not recognize the tort of negligent infliction of emotional distress. Dkt. 34 at 15–16. Defendant fundamentally misunderstands the choice-of-law analysis. The choice-of-law analysis has two steps: First, the court must determine which state's choice-of-law rules apply. Second, the court must conduct the choice-of-law analysis under the rules of the state that were determined to be applicable in the first step. In its motion, Defendant describes the first step, but fails to mention the second step at all, much less apply it. Under a proper application of both steps of the choice-of-law analysis, California law applies to Plaintiffs' negligent infliction of emotional distress claim. Because California law recognizes a negligent infliction of emotional distress tort, Plaintiffs have properly stated a claim pursuant to Rule 12(b)(6).

Defendant is correct in its statement that "[t]he applicable law in an FTCA action is the law of the state where the alleged tortious act or omission occurred." Dkt. 34 at 15 (citing 28 U.S.C § 1346(b)). In *Richards v. United States*, 369 U.S. 1 (1962), the Supreme Court explained that in multistate tort cases, federal courts conducting a choice-of-law inquiry are required "to look in the first instance to the law of the place where the acts of negligence took place," not "the place where the negligence had its operative effect." *Id.* at 10. While the events of this case took place in multiple states, the initial negligent conduct,

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
Case No. 5:23-cv-05793-BLF

namely, the separation of Ms. R.H. from her minor children, occurred in Texas. As such, Plaintiffs agree with Defendant that this Court should apply Texas's choice-of law framework.

However, Defendant fails to conduct the choice-of-law analysis under Texas's choice-of-law framework at all, instead concluding without discussing any analysis that the "most significant relationship" is to Texas. *See* Dkt. 34 at 15–16. Texas's choice-of-law framework indeed uses the "most significant relationship" test to determine which state tort law to apply. *See Gutierrez v. Collins*, 583 S.W. 2d 312, 318 (Tex. 1979) (citing Restatement (Second) of Conflict of Laws §§ 6, 145 (1971)); *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 848 (Tex. 2000) (citations omitted). Under the most significant relationship test, one must weigh a number of factors, including: (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied. *Torrington*, 46 S.W.3d at 848 (citing Restatement (Second) of Conflict of Laws § 6(2)); *Gutierrez*, 583 S.W.2d at 318–19 (same). In tort cases, relevant contacts that should also be considered include: "(a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered." *Torrington*, 46 S.W.3d at 848 (quoting Restatement (Second) of Conflict of Laws § 145(2)); *Gutierrez*, 583 S.W. 2d at 319 (same). Under this analysis, "[t]he number of contacts with a state is not determinative." *Torrington*, 46 S.W.3d at 848 (citation omitted). Instead, the court "must evaluate the contacts in light of the state policies underlying the particular substantive issue." *Id.*

A recent Central District of California case examined an analogous fact pattern where the initial family separation occurred in Texas, family members were then detained in various locations in Texas and Georgia, and ultimately reunified and living together in California. *Rodriguez v. United States*, No. 2:22-cv-02845-JLS-AFM, 2022 WL 19237182, at *5 (C.D. Cal. Dec. 22, 2022). In *Rodriguez*, the court applied Texas's choice-of-law test and determined that California law applied. *Id.* at *5–6. The court

reasoned that Texas neither had a strong interest in ensuring its law applied in this case, nor had an interest as the place where the injury or the conduct causing the injury occurred because (1) "[n]either party is domiciled in Texas," and (2) "some of the acts occurred in Georgia and some of the injuries occurred in California." *Id.* at \*5 (citing *Lacey v. United States*, No. 13-132, 2013 WL 4759270, at \*2 (D. Ariz. Sept. 4, 2013) (finding that Texas's interest in applying its damages law was diminished in FTCA case where "there are no Texas plaintiffs to be compensated and no Texas defendants to be protected")). The court next analyzed California's interest and ultimately determined that while California did not have a particularly strong interest in the application of its laws, the plaintiff resided in California and, because the plaintiff's immigration proceedings were ongoing in California, California was the state where the relationship continued between the plaintiff and the government. *Id.* at \*6. Because neither state had a strong interest in the application of its laws, the plaintiff's "state of residence becomes a more important factor" and both the state of residence and the state of ongoing relationship between the parties "cut in favor of applying California tort law." *Id.* As such, the court ruled that "under Texas choice-of-law principles, California has the most significant relationship to the action here." *Id.*

This same analysis is appropriate and applicable in the present case. The initial seven factors to be considered under the Restatement (Second) of Conflict of Laws and Texas case law do not weigh heavily in favor of one state's laws over the other for the same reasons as discussed in *Rodriguez*. However, like in *Rodriguez*, both the domicile of the parties and the state where the parties' relationship continues weighs in favor of California. Plaintiffs have resided in California for over four-and-a-half years, since their reunification in California in February 2021. Ms. R.H. is employed in California and J.M.R. and S.M.R. are in school in California. Meanwhile, Defendant is the U.S. government and is not domiciled in either Texas or California. *See Vaughan v. Northup*, 40 U.S. 1, 6 (1841) ("The United States, in their sovereign capacity, have no particular place of domicil . . . ."). The ongoing relationship between Plaintiffs and Defendant is also located in California because Plaintiffs' immigration matters continue in California: the San Francisco Asylum Office adjudicated J.M.R. and S.M.R.'s asylum applications and Ms. R.H.'s immigration case remains pending before the San Francisco Immigration Court. Because these two factors cut in favor of applying California state law and the remaining factors do not weigh heavily in either

direction, under Texas choice-of-law principles, California has the most significant relationship to the instant action. *See Rodriguez*, 2022 WL 19237182, at *6.

California state law allows for a tort action under a negligent infliction of emotional distress claim. *See* Cal. Civ. Jury Instr. (BAJI) § 12.80; *Galvan v. Walt Disney Parks & Resorts, U.S., Inc.*, 425 F. Supp. 3d 1234, 1245 (C.D. Cal. 2019) (citing *Wong v. Tai Jing*, 189 Cal. App. 4th 1354, 1377–78 (Cal. Ct. App. 2010)). Plaintiffs have properly pled the elements of such a claim under California law, and Defendant does not argue otherwise. *See* Cal. Civ. Jury Instr. (BAJI) § 12.80 (listing elements as (1) defendant engaged in negligent conduct; (2) plaintiff suffered serious emotional distress; and (3) defendant's negligent conduct was a cause of the serious emotional distress); Compl. ¶¶ 89–157, 164–88, 193–97; *see also* Dkt. 34 at 15–16. As such, all of Plaintiffs' claims, including the claim for negligent infliction of emotional distress, are properly pled and Defendant's Motion to Dismiss under Rule 12(b)(6) should be denied.

## V.   CONCLUSION

For the reasons stated above, this Court should deny Defendant's Motion to Dismiss.

Dated: July 29, 2024

Respectfully submitted,

/s/ *Claudia Valenzuela*
Claudia Valenzuela*
Jessica Zhang*
IMMIGRANT LEGAL DEFENSE
1301 Clay Street, #70010
Oakland, CA 94612

Lisa Weissman-Ward
Jayashri Srikantiah
IMMIGRANT RIGHTS' CLINIC
Mills Legal Clinic at Stanford Law School
Crown Quadrangle, 559 Nathan Abbott Way
Stanford, CA 94305

*Attorneys for Plaintiffs*

*\*admitted pro hac vice*

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
Case No. 5:23-cv-05793-BLF