UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MS. R.H., et al.,<br><br>            Plaintiffs,<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br><br>            Defendant. | Case No. 23-cv-05793-EKL<br><br>**ORDER GRANTING MOTION TO DISMISS IN PART AND DENYING IN PART**<br><br>Re: Dkt. No. 34 |

      This action arises from the alleged force separation by immigration officials of Ms. R.H. and her two minor sons, J.M.R. and S.M.R. (together, "Plaintiffs") after they crossed the United States-Mexico border into Texas in October 2020. Plaintiffs allege that the forcible separation violated court orders, federal law, and agency policies. Plaintiffs assert claims for intentional infliction of emotional distress, negligent supervision, negligence, intentional interference with parental consortium by person without right of custody, and negligent infliction of emotional distress. Compl. ¶¶ 189-213, ECF No. 1 ("Compl."). They seek damages pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq*.

      Defendant United States of America ("Defendant") moves to dismiss all claims for lack of subject matter jurisdiction, and to dismiss the claim for negligent infliction of emotional distress for failure to state a claim. Mot. to Dismiss at 1 ("Mot."), ECF No. 34. The Court reviewed the parties' briefs, and heard oral argument on November 20, 2024. For the reasons discussed herein, the Motion is GRANTED in part and DENIED in part.

## I. BACKGROUND[1]

Beginning in approximately 2016, members of the Mara Salvatrucha gang ("MS-13") targeted Ms. R.H.'s husband ("Mr. M.C.") for refusing to assist in illicit gang activities. Compl. ¶ 80 ("Compl."), ECF No. 1. In 2017, MS-13 members shot and killed Mr. M.C. in front of Plaintiffs. *Id*. ¶ 81. The MS-13 repeatedly threatened Ms. R.H. for cooperating with the police, including holding a gun to her head and demanding that she retract her statement. *Id*. ¶ 82. On or around October 1, 2020, Plaintiffs fled El Salvador to seek asylum in the United States.[2] *Id*. ¶ 83.

On October 10, 2020, Plaintiffs crossed the U.S.-Mexico border near Del Rio, Texas, where they were apprehended by United States Customs and Border Protection ("CBP") agents.[3] *Id*. ¶ 84. Ms. R.H. told the CBP agents that she feared returning to El Salvador because gang members had murdered her husband and continued to threaten Plaintiffs. *Id*. ¶ 85. CBP employees took Plaintiffs to the Del Rio border station, where Ms. R.H. presented her own identification, her children's birth certificates and passports, and proof of her husband's death. *Id*. ¶ 86. CBP employees fingerprinted and photographed Plaintiffs and determined they were a valid "family unit," assigned Plaintiffs a family unit number, and returned them to Mexico.[4] *Id*. ¶ 87.

On October 13, 2020, Plaintiffs attempted to enter the United States a second time, near Eagle Pass, Texas. *Id*. ¶ 89. This time, two uniformed men apprehended Plaintiffs and transferred them into the custody of two CBP agents on the side of the road. *Id*. ¶¶ 91-92. Ms. R.H. informed the agents that she was afraid of returning to El Salvador because of her husband's murder and presented the same identification documents, but rather than reviewing the documents, the agents spoke to Ms. R.H. in an "aggressive and threatening tone," and accused her of "presenting false

---

[1] The facts are taken from the complaint and assumed to be true for purposes of this motion.

[2] At the time Plaintiffs left El Salvador, S.M.R. was 11 years old and J.M.R. was 14. *Id*. ¶ 83.

[3] The CBP is a sub-agency of the United States Department of Homeland Security ("DHS"), and the United States Border Patrol ("USBP") is a sub-agency of CBP. *See id*. ¶ 39 n.19. The complaint refers to CBP and USBP agents as "Border Patrol" agents. *Id*. This Order refers to employees of both agencies as CBP agents or employees.

[4] Plaintiffs allege that CBP agents' separation of the family violated heightened protections given to "family units" under laws, policies, and standard agency practices instituted by the DHS, CBP, and USBP. Compl. ¶¶ 46-47, 78.

documents" and being a "trafficker." *Id.* ¶¶ 95-100. Although Ms. R.H. asked the CBP agents to administer a DNA test to verify her relationship with her sons, the agents did not administer the test or take any other meaningful steps to verify the family relationship. *Id.* ¶¶ 102-105.

Plaintiffs allege that during this encounter, Ms. R.H. was "visibly ill and bleeding from her abdomen," and that the hand she applied to the wound "was covered in blood and was plainly visible to the Border Patrol agents."[5] *Id.* ¶ 107. The CBP agents accused Ms. R.H. of "faking her injury as a pretext to stay in the United States." *Id.* ¶¶ 106, 108. They separated Ms. R.H. from J.M.R. and S.M.R., and forcibly placed her in a van while the boys "cried out and fought to stay with her[.]" *Id.* ¶ 110. The agents placed the boys in a separate compartment of the same van where they "could not see or hear their mother." *Id.* ¶ 111.

The CBP agents drove a short distance, stopped the van, and told Ms. R.H. to "walk across a bridge back to Mexico by herself." *Id.* ¶ 113. She was not given any documents or told where J.M.R. and S.M.R. would be taken. *Id.* The agents drove J.M.R. and S.M.R. to the Eagle Pass South Border Patrol facility, where they were fingerprinted and photographed. *Id.* ¶ 117. CBP employees created a record for J.M.R. and S.M.R., but the official forms omitted the family separation and made no reference to any trafficking concerns. *Id.* ¶¶ 120-124. Plaintiffs further allege that CBP employees deleted the family unit number that had been assigned days earlier, and processed the boys as unaccompanied minors. *Id.* ¶ 125.

On or around October 15, 2020, CBP employees transferred J.M.R. and S.M.R. into the custody of the Office of Refugee Resettlement ("ORR"). *Id.* ¶ 127. The boys remained at an ORR shelter in San Antonio for over a month. *Id.* ¶¶ 127-129. Plaintiffs were initially able to communicate by phone but lost contact after a week. *Id.* ¶¶ 130-131.

On or about November 28, 2020, ORR employees moved J.M.R. and S.M.R. to the Bronx, New York, where they were placed in Abbott House, an ORR-licensed foster care home. *Id.* ¶¶ 144-145. During their time at Abbott House, J.M.R. and S.M.R. were "forced . . . to spend the

---

[5] According to the complaint, Ms. R.H. had intestinal surgery about one month before fleeing El Salvador, and the wound was slow to heal due to her diabetes. *Id.* ¶ 90.

majority of their days and nights in a closed bedroom, [and] only allow[ed] to leave when they needed to use the bathroom." *Id*. ¶ 146  They were not permitted to speak or interact with the other children in the house, or with the outside world. *Id*.  Plaintiffs allege that the separation, the transfer to Abbott House (which occurred without explanation), and the conditions at Abbott House exacerbated the boys' feelings of anxiety, confusion, panic, and depression. *Id*. ¶¶ 144, 147.

After Ms. R.H. was returned to Mexico, individuals "associated with Mexican law enforcement and/or Mexican cartels" kidnapped and held her hostage with others in a building in Ascensión, Mexico.  Her captors repeatedly physically and sexually assaulted her and "threaten[ed] to kill her unless she paid a ransom." *Id*. ¶¶ 132-135.  After nearly a month of this torture, Ms. R.H. gained her freedom and made her way to Ciudad Juarez, Mexico. *Id*. ¶¶ 137-140.  From late November to the end of December 2020, Ms. R.H. presented herself at the U.S.-Mexico border at least four times; each time she requested asylum, expressed her fear of returning to El Salvador and Mexico, and described the family separation. *Id*. ¶ 141.  Each time, she was turned away. *Id*.

In December 2020, Ms. R.H. learned the boys were at Abbott House. *Id*. ¶ 152.  With help from legal services, the family met by video call. *Id*. ¶ 153.  In February 2021, following DHS approval of her request for humanitarian parole, Ms. R.H. lawfully entered the United States. *Id*. ¶¶ 158-160.  On February 27, 2021, Plaintiffs were reunited in person in California, where they continue to reside. *Id*. ¶¶ 161-164.

Plaintiffs allege that at the time the separation occurred, forcible family separations were prohibited by Executive Order 13841, and by a nationwide injunction issued by the United States District Court for the Southern District of California in *Ms. L v. U.S. Immigrations and Customs Enforcement*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018) ("*Ms. L* injunction").[6] *Id*. ¶ 38.  After the court issued the *Ms. L* injunction, the DHS, CBP, and USBP created policies and procedures

---

[6] On June 20, 2018, President Trump issued Executive Order 13841, entitled "Affording Congress an Opportunity to Address Family Separation."  Exec. Order No. 13841, 83 Fed. Reg. 29435, 29435 (June 20, 2018).

4

1   regarding family separation practices. *Id*. ¶ 39.  On June 27, 2018, the CBP Commissioner issued
2   a memorandum directing compliance with the *Ms. L* injunction and enumerating a limited set of
3   circumstances under which CBP employees are authorized to separate families. *Id*. ¶ 40.  In a
4   January 10, 2020 memorandum, the USBP reiterated to Border Patrol agents the limited
5   circumstances authorizing family separation. *Id*. ¶ 41.  Despite Executive Order 13841, the *Ms. L*
6   injunction, and the newly established CBP and USBP policies and procedures, agency employees
7   continued separating families at the border in violation of the heightened protections given to
8   family units. *Id*. ¶ 43.  In January 2020, the same court issued a second order enforcing the *Ms. L*
9   injunction, "emphasiz[ing] that U.S. government employees bore the 'burden to prove lack of
10  parentage before making a separation issue decision.'" *Id*. ¶ 45 (quoting *Ms. L v. U.S. Immigr. &
11  Customs Enf't (Ms. L II)*, 415 F. Supp. 3d 980, 989 (S.D. Cal. 2020)).

12    According to Plaintiffs, CBP employees violated federal law and policies regarding family
13  separation by erroneously concluding that Plaintiffs were not a valid family unit; by refusing to
14  provide Ms. R.H. with medical care; by separating Plaintiffs at the border; by detaining J.M.R. and
15  S.M.R. in ORR custody under substandard conditions; by forcibly returning Ms. R.H. to Mexico;
16  and by refusing Ms. R.H.'s multiple requests for asylum and reunification. *Id*. ¶ 78.  Plaintiffs
17  provide detailed allegations concerning the ongoing mental health consequences of their treatment
18  at the hands of CBP agents, and of the separation itself. *Id*. ¶¶ 165-188.

19     Defendant moves to dismiss all claims under Rule 12(b)(1) for lack of subject matter
20  jurisdiction, and to dismiss the claim for negligent infliction of emotional distress under Rule
21  12(b)(6) for failure to state a claim.  Mot. at 1.

## II. MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

### A. Legal Standard

Under Rule 12(b)(1), a court must dismiss a complaint if the plaintiff fails to demonstrate that the court has subject matter jurisdiction. *Tosco Corp. v. Cmtys. for Better Env't*, 236 F.3d 495, 499 (9th Cir. 2001).  In ruling on a Rule 12(b)(1) motion, "the Court accepts the allegations of the complaint as true and affords plaintiffs the benefit of all favorable inferences that can be drawn from the alleged facts." *Id*.  But the Court may also consider evidence submitted with the

5

Rule 12(b)(1) motion to resolve factual disputes concerning the existence of jurisdiction.[7] *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988). Plaintiffs bear the burden of establishing subject matter jurisdiction. *Meyer*, 373 F.3d at 1039.

### B. Discussion

Defendant contends that the Court lacks subject matter jurisdiction as to all of Plaintiffs' claims due to sovereign immunity. "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). A Rule 12(b)(1) motion is "a proper vehicle for invoking sovereign immunity from suit." *Pistor v. Garcia*, 791 F.3d 1104, 1110-11 (9th Cir. 2015).

Plaintiffs bring their tort claims pursuant to the FTCA, which "operates as a limited waiver of sovereign immunity from suits for negligent or wrongful acts of government employees." *Gonzalez v. United States*, 814 F.3d 1022, 1026 (9th Cir. 2016). Defendant argues that the FTCA's waiver of sovereign immunity does not apply because there is no private person analog for the challenged conduct, and because Plaintiff's claims are barred by three exceptions. If Plaintiffs' claims fall within one or more of these exceptions, the Court lacks subject matter jurisdiction over them. *Nurse v. United States*, 226 F.3d 996, 1000 (9th Cir. 2000). The Court addresses each of Defendant's arguments in turn.

#### 1. The private person analog requirement

Under the FTCA, the United States government may be liable only "in the same manner and to the same extent as a private individual under like circumstances[.]" 28 U.S.C. § 2674; *see also United States v. Olson*, 546 U.S. 43, 44 (2005) (holding that private tort actions may be asserted against the government "under circumstances where the United States, if a private person,

---

[7] A Rule 12(b)(1) motion may attack jurisdiction on facial or factual grounds. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a facial attack, the moving party asserts that the allegations are insufficient on their face to invoke federal jurisdiction. In a factual attack, the challenger disputes the truth of the allegations that would invoke federal jurisdiction. *Id*. Defendant does not specify whether it mounts a facial or factual attack on the pleadings. Its challenge appears to be facial in some respects, *see* Mot. at 8-14, but factual in other respects, *see* Mot. at 14-15 and Reply at 4-5, ECF No. 42 (relying on Declaration of James De La Cruz, ECF No. 34-1). In light of the Court's rulings, Defendant's failure to specify the nature of its Rule 12(b)(1) motion does not impact the Court's analysis.

6

1    would be liable to the claimant in accordance with the law of the place where the act or omission

2    occurred."). This principle is typically referred to as the "private person analog" because the

3    government's exposure to liability turns on whether liability would attach to analogous conduct

4    performed by a private person.

5        Essentially, Defendant argues that there is no private person analog to the challenged

6    conduct here because the claims arise from the government's enforcement of immigration law, and

7    "only the federal government has the authority to enforce federal immigration laws." Mot. at 9.

8    Defendant does not address any of Plaintiffs' tort claims with specificity.

9        This argument is not persuasive because it interprets the private person analog too

10   narrowly. "Recognizing that the federal government 'could never be exactly like a private actor,'

11   the Ninth Circuit only requires courts to 'find the most reasonable analogy' to private tortious

12   conduct." *A.P.F. v. United States*, 492 F. Supp. 3d 989, 994 (D. Ariz. 2020) (citing *Dugard v.*

13   *United States*, 835 F.3d 915, 919 (9th Cir. 2016)); *see also Fuentes-Ortega v. United States*, 640

14   F. Supp. 3d 878, 884 (D. Ariz. 2022) (focusing on "the behavior involved"). Indeed, courts in the

15   Ninth Circuit have repeatedly recognized private person analogs in the context of family

16   separation cases where the federal agents' actions were alleged to be negligent or motivated by

17   malice. *See Fuentes-Ortega*, F. Supp. 3d at 884-85 (denying motion to dismiss claims for

18   intentional infliction of emotional distress, negligence, and other torts in family separation case

19   because the private person analog requirement was satisfied, and denying motion to dismiss); *see*

20   *also Eduardo I.T. v. United States of America*, No. 22-cv-05333-DMR, 2023 WL 10354060, at *8-

21   9 (N.D. Cal. Feb. 24, 2023) (same); *see also Wilbur P.G. v. United States*, No. 4:21-cv-04457-

22   KAW, 2022 WL 3024319, at *5 (N.D. Cal. May 10, 2022) (same); *see also A.P.F.*, 492 F. Supp.

23   3d at 94-95 (same). In each of these cases, immigration agents separated parents from children,

24   sent children to facilities run by government contractors, and either detained or deported the

25   parents; and in each case, the court found that the private person analog was satisfied. In light of

26   the analogous circumstances, the Court agrees with the reasoning of these opinions and concludes

27   that the private person analog requirement is satisfied here as well. Thus, the Court denies

28   Defendant's motion to dismiss based on its narrow characterization of the challenged conduct.

### 2. The discretionary function exception

The discretionary function exception provides that sovereign immunity remains intact for claims that are "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved [is] abused." *Gonzalez*, 814 F.3d at 1027 (citing 28 U.S.C. § 2680(a)). The government bears the burden of demonstrating that this exception applies. *Id*. (citing *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1174 (9th Cir.2002)).

To determine whether the discretionary function exception applies to claims under the FTCA, courts apply the two-part test established in *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). In the first step, the court asks whether the challenged action was a discretionary one, *i.e.*, whether it "involve[d] an element of judgment or choice." *Gonzalez*, 814 F.3d at 1027 (citing *GATX/Airlog Co.*, 286 F.3d at 1173). "This part of the test is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Fuentes-Ortega*, 640 F. Supp. 3d at 882 (citing *Berkovitz*, 486 U.S. at 536). "Second, if there is room for judgment, courts determine whether the judgment concerns public policy." *Id*. If it does, or if the challenged decision "is one to which a policy analysis could apply," the discretionary function exception bars the claim. The second part of the test "prevents judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy." *Id*. (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984) (internal quotation marks omitted)).

Defendant argues that the discretionary function exception bars Plaintiffs' claim for negligent supervision because government decisions related to the hiring, training, and supervision of government employees and subcontractors "inherently involve the kind of judgment that the exception was meant to protect." Mot. at 12 (citing *Vickers v. United States*, 228 F.3d 944, 950 (9th Cir. 2000) (holding that discretionary function exception barred claim for negligent supervision and retention arising from injuries caused by INS agent's use of a government-issued firearm)). Defendant is correct that the discretionary function exception generally bars negligent supervision claims. *See Nurse*, 226 F.3d at 1001-02"; *see also Vickers*, 228 F.3d at 950.

8

However, Plaintiffs respond that the exception does not apply here because, under step two of the *Berkovitz* test, there is no "plausible policy consideration" in allowing supervised CBP employees to break the law. The theory underlying this argument is that, because the family separation alleged in this case violated court orders, statutory and regulatory instructions, and agency directives, holding Defendant liable for this conduct would not amount to judicial second-guessing of policy decisions. *See* Opp. Br. at 8 ("Opp."), ECF No. 41.

To support this argument, Plaintiffs rely on *Tonelli v. United States*, 60 F.3d 492 (8th Cir. 1995). In that case, the plaintiffs claimed that postal employees had tampered with items in their post office box. After reporting their concern to the local postmaster, they sued the postal service under the FTCA for negligent supervision, among other torts. *Id.* at 494. The district court found that the discretionary function exception barred the negligent supervision claim, and entered summary judgment for the government. *Id.* at 496. The Eighth Circuit reversed, holding that summary judgment was not appropriate because the plaintiffs had alleged that the post office failed to act after it had notice of its employees' illegal behavior. *Id.* ("Failure to act after notice of illegal action does not represent a choice based on plausible policy considerations.").

Defendant argues that *Tonelli* does not apply here because Plaintiffs do not specifically allege that CBP knew its employees were not following applicable law or agency policy regarding family separation.[8] Reply at 3. The Court agrees that, although *Tonelli* may support Plaintiffs' position in principle, Plaintiffs do not clearly allege that Defendant had actual knowledge of illegal action by CBP employees at the time the separation occurred. Rather, Plaintiffs allege generally: (1) that "Defendant and its employees in supervisory roles at DHS and HHS" had a duty "to properly supervise CBP, USBP, and ORR agents, as well as any subcontractors of those agents[,]" Compl. ¶ 208; (2) that Defendant's employees "engaged in the conduct described above" because they "lacked proper supervision[,]" *id.* ¶ 209; and (3) that "Defendant had supervisorial positions over employees within DHS and HHS, as well as their subcontractors, and had prior knowledge of

---

[8] Defendant notes that this Court is not bound by the Eighth Circuit's decision in *Tonelli*. At the same time, Defendant also relies on *Tonelli* to support its argument that negligent supervision claims are generally barred by the discretionary function exception. *See* Reply at 12.

9

1    their propensity to engage in the conduct described herein[,]" *id.* at 211. Finally, Plaintiffs allege

2    that "Defendant knew or should have known that retaining these employees created a particular

3    risk or hazard of harm to migrant families." *Id.* ¶ 211. But Plaintiffs do not allege which agency's

4    supervisors had prior knowledge of their employees' illegal conduct, what "prior knowledge" the

5    agency (or agencies) had, or whether they had that knowledge at the time of the incidents alleged

6    in the complaint. Thus, even if *Tonelli* precludes dismissal based on prior knowledge of illegal

7    conduct, the current allegations are too general and conclusory to preclude dismissal under Rule

8    12(b)(1).

9    Accordingly, the Court dismisses the negligent supervision claim, but grants leave to

10   amend the complaint. Plaintiffs may add specific facts regarding Defendant's knowledge, at the

11   time of the alleged incidents, of CBP employees' failure to comply with applicable law or agency

12   policies. *See Sanchez v. United States*, No. 18-cv-1550-AJB-AGS, 2020 WL 1157200, at *3 (S.D.

13   Cal. Mar. 10, 2020) (dismissing negligent supervision claim based on discretionary function

14   exception with leave to amend complaint to add specific facts showing that the defendant had

15   actual knowledge of the employee wrongdoing that gave rise to the claim).

16   Defendant argues that the discretionary function exception also bars the negligent

17   supervision claim to the extent that it encompasses government subcontractors. Mot. at 12-13; *see*

18   *also* Reply at 3-5. Here, the parties dispute whether the scope of ORR's Cooperative Agreement

19   with Abbott House required it to ensure compliance with safety standards related to the care of

20   unaccompanied minors.[9] If so, Plaintiffs argue that the exception would not apply because ORR

21   "would not be making policy judgments when supervising for the purposes of safety compliance,

22   but rather, merely implementing precautions that have already been agreed upon."[10] Opp. at 10.

---

[9] Defendant submits the Cooperative Agreement with its opening brief. *See* Cruz Decl. Ex. A, ECF No. 34-1.

[10] On this point, Plaintiffs rely principally on *Marlys Bear Med. v. United States*, 241 F.3d 1208, 1216-17 (9th Cir. 2001) (holding that exception did not bar claim for negligent supervision because logging contract required government to ensure that contractor complied with applicable safety regulations). Defendant distinguishes this case, arguing that its contract with Abbott House did not require specific action to ensure compliance. Reply at 4-5. Given the vague nature of the allegations, the Court does not resolve this issue at this time.

1   According to Defendant, however, the Cooperative Agreement "vests discretion and policy
2   judgment" regarding safety compliance with Abbott House, satisfying both prongs of the
3   *Berkovitz* test. Reply at 5.
4   With regard to injuries related to Abbott House, Plaintiffs assert that the placement caused
5   J.M.R. and S.M.R. to experience harm because the transfer and the conditions in Abbott House,
6   described in paragraphs 144 through 147 of the complaint, "further exacerbated both J.M.R.'s and
7   S.M.R.'s state of depression and anxiety." But, as discussed above, Plaintiffs did not provide any
8   detailed allegations for this claim. Although the complaint states generally that Defendant failed
9   to adequately supervise agency subcontractors, *see id*. ¶¶ 208 and 211, Plaintiffs do not allege that
10  ORR employees failed to properly supervise Abbott House, how they failed, or how the failure to
11  supervise Abbott House harmed Plaintiffs. Thus, the allegations are too general and conclusory
12  for the Court to determine whether the exception bars this claim with respect to subcontractors.
13  As stated above, this claim is dismissed, but Plaintiffs may amend the complaint to add
14  facts regarding the failure of ORR employees to properly supervise Abbott House. The Court
15  does not presently decide whether the discretionary function exception would bar Plaintiffs'
16  negligent supervision claim if it were more clearly alleged.

### 3. The foreign country exception

18  The FTCA does not waive the government's sovereign immunity with respect to a "claim
19  arising in a foreign country." 28 U.S.C. § 2680(k). "Arising in" means that the harm occurred on
20  foreign soil, regardless of whether an act or omission that could have caused the injury occurred in
21  the United States. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 704-10 (2004).
22  Defendant argues that Plaintiffs' claims are partially barred by the foreign country
23  exception because many of Ms. R.H.'s alleged injuries occurred in Mexico rather than the United
24  States. Mot. at 13. However, Plaintiffs plausibly allege that their injuries arise from the unlawful
25  separation that occurred in Texas and their treatment by CBP agents rather than the kidnapping
26  and abuse experienced by Ms. R. H. in Mexico . Compl. ¶¶ 89-132, 157. *See Arce v. United*
27  *States*, 899 F.3d 796, 801 n.5 (9th Cir. 2018) ("A claim arises where 'the last act necessary to
28  establish liability occurred,' and '[a]n injury "occurs" where it is first suffered, even if a negligent

11

act results in further or more serious harm.'") (quoting *S.H. by Holt v. United States*, 853 F.3d 1056, 1061-62 (9th Cir. 2017)). Accordingly, the foreign country exception does not bar these claims.

### 4. The independent contractor exception

The FTCA does not waive the government's sovereign immunity with respect to acts undertaken by independent government contractors. 28 U.S.C. § 2671. The independent contractor exception to the FTCA "protect[s] the United States from vicarious liability for the negligent acts of its independent contractors." *Edison v. United States*, 822 F.3d 510, 517-18 (9th Cir. 2016).

Defendant contends that the independent contractor exception bars Plaintiffs' allegations that J.M.R. and S.M.R. suffered harm while at Abbott House because the minors' injuries "are based entirely on actions taken by independent contractors rather than government employees." Mot. at 14-15. Plaintiffs dispute this characterization, arguing that the minors' injuries were caused by the separation, and the incorrect designation of the boys as unaccompanied minors, rather than the acts of an independent contractor. Opp. at 13.

The complaint plausibly alleges that Plaintiffs' tort claims arise from a family separation that violated court orders, applicable law, and agency policy. Compl. ¶¶ 146-148, 174-188. If CBP employees had not separated Plaintiffs at the U.S.-Mexico border, the boys would not have been placed at Abbott House and would not have experienced the difficult conditions that resulted in (or exacerbated) their harm. *See A.P.F.*, 492 F. Supp. 3d at 993 (rejecting similar argument where minor plaintiffs suffered abuse while in custody of federal contractors after separation from parents at the border). Moreover, whether Defendant or Abbott House caused the minors' injuries is a factual question that cannot be resolved at this stage. *Id.* at 998 ("To the extent the United States argues that the contractors caused Plaintiffs' harm, and not the government, this raises a fact-intensive issue inappropriate for resolution at this stage."). Accordingly, the independent contractor exception does not bar Plaintiffs' claims to the extent they are based on the minors' alleged injuries.

1  **III.   MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

2  Defendant argues that even if the Court has subject matter jurisdiction over all of Plaintiffs' claims, their claim for negligent infliction of emotional distress fails under Rule 12(b)(6).

**A.   Legal Standard**

"To survive a [Rule 12(b)(6) motion], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). When ruling on a Rule 12(b)(6) motion, the court generally "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). If dismissal is warranted, the court should grant leave to amend "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (citation omitted).

**B.   Discussion**

In FTCA actions, the applicable law is the law of the place where the negligent acts occurred. 28 U.S.C. § 1346(b); *see also Richards v. United States*, 369 U.S. 1, 10 (1962) (the FTCA "requires federal courts, in multistate tort actions, to look in the first instance to the law of the place where the acts of negligence took place"). Following this principle, the parties agree that the Court must apply Texas choice-of-law rules. Mot. at 15-16; Opp. at 18-19. However, the parties disagree over whether the choice-of-law framework under Texas law requires the application of California, rather than Texas, tort law. The parties agree, however, that California law recognizes a claim for negligent infliction of emotional distress, whereas Texas tort law does not. *See Valenzuela v. Aquino*, 853 S.W.2d 512, 513 (Tex. 1993) ("No action for negligent

infliction of emotional distress exists in Texas.").

Texas uses a "most significant relationship" test to decide choice-of-law issues. *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 848 (2000). Under this test, the following general factors are used to decide a choice-of-law question:

> (a) [T]he needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of the law to be applied.

*Id*. In tort cases, courts also consider relevant contacts such as: (a) where the injury occurred; (b) where the injury-causing conduct occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered. *Id.* (citing Restatement (Second) of Conflict of Laws § 145(2) (1971)). The number of contacts with a state is not determinative; rather, the court "evaluate[s] the contacts in light of the state policies underlying the particular substantive issue." *Id*.

The parties agree that the seven general factors under *Torrington* do not weigh heavily in favor of applying the law of one state over the other. Opp. at 20; Reply at 9. The Court therefore turns to the other four factors applicable to tort cases.

Here, although Plaintiffs reside in California, all of the relevant actions and injuries occurred in Texas.[11] *See Torrington*, 46 S.W.3d at 849 (noting that the plaintiff's residence "is a context to be taken into account in choice-of-law decisions."). Plaintiffs allege that they were apprehended in Texas by CBP agents and were separated in violation of existing law and policy. Compl. ¶¶ 89-111; *see also id.* ¶¶ 170-188 (alleging that their injuries arose as a result of the separation). Plaintiffs further allege that the agents processed the boys as unaccompanied minors and transferred them into ORR custody for over a month in Texas, from which they were eventually sent to an ORR-licensed foster care home out of state. *Id*. ¶¶ 127-129, 144-145. Under

---

[11] Plaintiffs' opposition brief emphasized that the foreign country and independent contractor exceptions do not bar their claims because all conduct and injuries can be traced to the family separation, which occurred in Texas. *See, e.g.*, Opp. at 11-13.

14

Texas law, though the "number of contacts is relevant," the "qualitative nature of the contacts controls." *Jackson v. W. Telemktg. Corp. Outbound*, 245 F.3d 518, 523 (5th Cir. 2001) (affirming application of Texas law where plaintiffs resided in California, but all relevant conduct occurred in Texas and the property at issue was in Texas).

Plaintiffs rely on *Rodriguez v. United States*, where a forcible family separation gave rise to a claim against the United States for negligent infliction of emotional distress. No. 2:22-cv-02845-JLS-AFM, 2022 WL 19237182, at *5 (C.D. Cal. Dec. 22, 2022). There, too, the court applied the Texas choice-of-law rules, but concluded that California law applied, preserving the plaintiffs' claim. *Id*. at *5-6. Although the facts in *Rodriguez* are similar, that case is distinguishable in the key respect that the challenged conduct occurred not only in Texas, but also in Georgia (the location from which Rodriguez was deported) and California (where Rodriguez's daughter resided when she learned her father had been deported). The court reasoned that although some relevant acts had occurred in Texas, the plaintiffs' California residence "bec[ame] a more important factor than it might otherwise," and denied the government's Rule 12(b)(6) motion to dismiss the claim. *Id*. at *4-6.

*Rodriguez* is not persuasive in this respect, and is not binding on this Court. Here, the "qualitative nature" of contacts with Texas weighs in favor of applying Texas law. *Jackson*, 245 F.3d at 523. Accordingly, Texas tort law applies in this action. Because Texas tort law does not recognize a claim for negligent infliction of emotional distress, Count 2 is dismissed with prejudice.

**IV.   CONCLUSION**

For the foregoing reasons, the Court DENIES the motion under Rule 12(b)(1) as to Count 1 for intentional infliction of emotional distress, Count 2 for negligent infliction of emotional distress, Count 3 for negligence, and Count 4 for intentional interference with parental consortium. The Court GRANTS the motion under Rule 12(b)(1) with leave to amend as to Count 5 for

//

//

negligent supervision, and GRANTS the motion under Rule 12(b)(6) without leave to amend as to Count 2. Plaintiffs may file an amended complaint consistent with this Order within 21 days.

**IT IS SO ORDERED.**

Dated: March 4, 2025

Eumi K. Lee
United States District Judge